IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS MARSHALL, SIMON CAMPBELL, ROBERT ABRAMS, and TIMOTHY DALY, | ) Case No. |
| | ) |
| | ) |
| | ) COMPLAINT FOR |
| Plaintiffs, | ) DECLARATORY, |
| | ) INJUNCTIVE, AND |
| v. | ) OTHER RELIEF |
| | ) |
| PETER C. AMUSO, Assistant Solicitor, Pennsbury School District, in his official and individual capacities; MICHAEL P. CLARKE, Solicitor, Pennsbury School District, in his official and individual capacities; PENNSBURY SCHOOL DISTRICT; CHERRISSA GIBSON, Director of Equity, Diversity, and Education, Pennsbury School District, in her official and individual capacities; CHRISTINE TOY-DRAGONI, President, Pennsbury School Board, in her official and individual capacities; JOSHUA WALDORF, Vice President, Pennsbury School Board, in his official and individual capacities; SHERWOOD (CHIP) TAYLOR, Assistant Secretary, Pennsbury School Board, in his official and individual capacities; HOWARD GOLDBERG, Member, Pennsbury School Board, in his official and individual capacities; T.R. KANNAN, Member, Pennsbury School Board, in his official and individual capacities; MICHAEL PALLOTTA, Member, Pennsbury School Board, in his official and individual capacities; LINDA PALSKY, Member, | ) 42 U.S.C. §§ 1983, 1988 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Pennsbury School Board, in her official )
and individual capacities; GARY )
SANDERSON, Member, Pennsbury )
School Board, in his official and individual )
capacities; DEBRA WACHSPRESS, )
Member, Pennsbury School Board, in her )
official and individual capacities; and )
ANN LANGTRY, former Supervisor of )
Communication Strategies, Pennsbury )
School District, in her individual capacity, )
  )
    Defendants. )
_____ )

## INTRODUCTION

The Pennsbury School District might be expected to teach Orwell's
1984 as literature or social commentary—not use it as an instruction
manual. But when Pennsbury's board members and officials set out to
censor citizens whose political views they despise, they hold little back.
Defendants have purported to grant themselves the power to arbitrarily
silence anyone speaking at school board meetings for any reason or no
reason at all—and they have wielded it in dramatic fashion. They have
done everything from shouting down citizens who dare question the
official narrative; conspired to silence and denounce dissenters; and
even "memory holed" speech based on its viewpoint, deleting speech
from public records as though it was never spoken.

Defendants' behavior speaks for itself. A four minute compilation of scenes from actual Pennsbury school board meetings, is available at link.ifs.org/PennsburyCensorship.

As Defendant School Board President Christine Toy-Dragoni explained to one parent who complained about Pennsbury's censorship, "Comments are found in violation of the [speech] policy by anyone who hears them and thinks so. It is then run by our solicitors who make the decision that something is in violation." But Pennsbury's Solicitor, Defendant Michael Clarke, is on record declaring that speakers "don't have First Amendment rights [at] public comment during a board meeting."

Something is very wrong with this school district.

Defendants are tasked with educating children about the nature of our government's relationship with the people, and about Americans' basic civil rights, including the First Amendment rights to free speech and petition the government for a redress of grievances. Future Pennsbury students learning about civil rights may study the decision in this case. That decision should restore and secure the fundamental rights that Defendants have so thoroughly trampled.

3

THE PARTIES

1.      Plaintiff Douglas Marshall is a natural person and citizen of Pennsylvania and of the United States, residing in Lower Makefield Township, Pennsylvania.

2.      Plaintiff Simon Campbell is a natural person and citizen of Pennsylvania and of the United States, residing in Lower Makefield Township, Pennsylvania.

3.      Plaintiff Robert Abrams is a natural person and citizen of Pennsylvania and of the United States, residing in Lower Makefield Township, Pennsylvania.

4.      Plaintiff Tim Daly is a natural person and citizen of Pennsylvania and of the United States, residing in Lower Makefield Township, Pennsylvania.

5.      Defendant Peter C. Amuso is the Assistant Solicitor of the Pennsbury School District, and in that capacity controls public comment at the Pennsbury School Board's public meetings. He is sued in his official and individual capacities.

6.      Defendant Michael P. Clarke is the Solicitor of the Pennsbury School District, and in that capacity controls public comment at the

Pennsbury School Board's public meetings. He is sued in his official and individual capacities.

7.      Defendant Pennsbury School District ("Pennsbury") is a local education agency comprised of four municipalities located in the southeastern corner of Bucks County, Pennsylvania: Yardley Borough, Lower Makefield Township, Falls Township, and Tullytown Borough. Pennsbury is charged with overseeing, administering, implementing and financing educational objectives for the K-12 students who fall within its borders. Pennsbury is managed by an elected nine-member board ("Pennsbury School Board"), which holds meetings open to the public on the third Thursday of each month in addition to other times.

8.      Defendant Cherrissa Gibson is Pennsbury's Director of Equity, Diversity, and Education. She is also the owner and principal of MgCL2 LLC, which does business as "Teach4EQUITY," and through which she consults with other school districts on the subject of group identity. Gibson is sued in her official and individual capacities.

9.      Defendant Christine Toy-Dragoni is the President of the Pennsbury School Board. She is sued in her official and individual capacities.

10.   Defendant Joshua Waldorf is the Vice President of the Pennsbury School Board. He is sued in his official and individual capacities.

11.   Defendant Chip Taylor is a member of the Pennsbury School Board who also serves as the board's Assistant Secretary. He is sued in his official and individual capacities.

12.   Defendant Howard Goldberg is a member of the Pennsbury School Board. He is sued in his official and individual capacities.

13.   Defendant T.R. Kannon is a member of the Pennsbury School Board. He is sued in his official and individual capacities.

14.   Defendant Michael Pallotta is a member of the Pennsbury School Board. He is sued in his official and individual capacities.

15.   Defendant Linda Palsky is a member of the Pennsbury School Board. She is sued in her official and individual capacities.

16.   Defendant Gary Sanderson is a member of the Pennsbury School Board.  He is sued in his official and individual capacities.

17.   Defendant Debra Wachspress is a member of the Pennsbury School Board. She is sued in her official and individual capacities.

18.    Defendant Ann Langtry was, at all times relevant to this complaint, Pennsbury's Supervisor of Communication Strategies. She is sued in her individual capacity.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

20.    Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## STATEMENT OF FACTS

### *Pennsbury's Censorship Policies and Practices*

21.    Defendant Pennsbury's official policy provides that "[i]n order to permit fair and orderly expression of public comment, the Board shall provide an opportunity at each open meeting of the Board for residents and taxpayers to comment on matters of concern, official action or deliberation before the Board prior to official action by the Board."

Authority, *Public Participation at Board Meetings*, Pennsbury Sch. Dist. Policy Manual § 903 ("Policy 903").

22.    Accordingly, "[t]he Board shall require that public comments be made prior to each official action of the Board." *Id.* Members of the public who are allowed to speak at Pennsbury school board meetings are allotted five minutes of speaking time. Policy 903, Guidelines.

23.    Until June 17, 2021, Policy 903 provided for two public comment periods at each school board meeting at which speakers were not limited to addressing agenda items: a one-hour period prior to voting, and a 30-minute period at the conclusion of the voting segment.

24.    At the June 17, 2021 meeting, the board revised this rule, effective at the next meeting. Policy 903 now limits speakers at the first public comment period to addressing agenda items. Speakers at the second public comment period remain free of this constraint, but people who speak at the first comment period, on agenda items, are barred from speaking at the second comment period on other matters, regardless of whether time remains in the period.

25.    "The presiding officer at each public Board meeting shall follow Board policy for the conduct of public meetings." Policy 903, Delegation of Responsibility.

26.    Policy 903 further provides that speakers at public school board meetings "must preface their comments" by announcing their name and address. Policy 903, Guidelines.

27.    Speakers at Pennsbury's public school board meetings may only address the presiding officer. They may not "address or question Board members individually." Policy 903, Guidelines.

28.    Per Pennsbury's "public participation" policy, "[t]he presiding officer" at school board meetings "may:

1. Interrupt or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant.

2. Request any individual to leave the meeting when that person does not observe reasonable decorum.

3. Request the assistance of law enforcement officers to remove a disorderly person when that person's conduct interferes with the orderly progress of the meeting.

4. Call a recess or adjourn to another time when the lack of public decorum interferes with the orderly conduct of the meeting.

5. Waive these rules with the approval of the Board.

Policy 903, Guidelines.

29.    Beyond interrupting and terminating speech deemed "personally directed, abusive [or] irrelevant," Defendants have also interpreted Policy 903 to allow them to excise such speech from the official recordings of Pennsbury School Board meetings.

30.    Challenged by a parent who complained about Pennsbury's censorship of speech, Defendant School Board President Christine Toy-Dragoni explained, "Comments are found in violation of the policy by anyone who hears them and thinks so. It is then run by our solicitors [Defendants Clarke and Amuso] who make the decision that something is in violation."

31.    Defendants do not believe that people who speak to them at board meetings have any First Amendment rights. At a March 6, 2014, Pennsbury School Board meeting, Plaintiff Robert Abrams complained that Pennsbury's Solicitor, Defendant Michael Clarke, had previously tried to silence him in violation of Abrams' First Amendment rights. Clarke interrupted Abrams, spoke over him, and declared, "you don't have First Amendment rights in here, this is public comment during a

board meeting, and as I've indicated before, if you're going to say things that are factually inaccurate, I'm going to have to correct you."

32. Policy 903 also provides that "[o]ffensive, obscene or otherwise inappropriate banners or placards, or those that contain personal attacks, will not be permitted within the meeting room. All other banners and placards will be permitted within the meeting room." Policy 903, Guidelines.

33. "Individuals who repeatedly violate" Pennsbury's speech policies "may have restrictions imposed on their right to be present or to speak at School Board meetings." Policy 903, Guidelines.

34. On May 20, 2021, Pennsbury, acting by and through the Defendant school board members, adopted a policy entitled *Civility*, Pennsbury Sch. Dist. Policy Manual § 922 ("Policy 922").

35. The "Civility Policy" provides that "[o]ffensive, inappropriate, intolerant, and/or threatening speech or behavior erodes the civil, orderly, and respectful environment that the Board seeks to promote in district schools, on district property, and at district-sponsored events and activities." Policy 922, Guidelines.

11

36.    The "Civility Policy" further provides, inter alia, that:

If a participant in any type of district meeting (I.E. IEP meeting, parent/teacher conference, Board meeting or other district sponsored activity) becomes disruptive, verbally abusive, or acts in a way which violates this policy, the individual responsible for chairing or hosting the meeting or event shall immediately ask the alleged offender to discontinue the behavior. If the alleged offender continues to act inappropriately, the meeting may be recessed, ended or continued without the participation of the alleged offender.

* * *

Communication between all stakeholders is expected to be civil, including via phone, email and other forms of verbal interaction. If at any time, any individual becomes disruptive, verbally abusive or acts in violation of this policy, district employee(s) maintain the obligation to end the communication immediately.

Individuals who repeatedly violate this policy may have restrictions imposed on their right to be present in district schools, on district property, and/or at district-sponsored events or activities. Limitations may also be placed on an individual's right to interact with members of district staff.

Violators of this policy may also be reported to law enforcement or other authorities.

Policy 922, Strategies for Addressing Incivility When it Occurs.

37.    At the Pennsbury School Board's April 15, 2021, meeting,

Defendant Toy-Dragoni declared her belief that the public comment

periods at school board meetings are limited public forums. But, she

added, "this board welcomes the public to comment on issues relevant to our work for the school district." Toy-Dragoni also disclaimed any "obligation to record or broadcast comments."

*Defendants' Censorship of Plaintiffs' Written Comments*

38.   Owing to the COVID-19 pandemic, Pennsbury held its school board meetings online, or online with very limited audience capacity, from April 2020 through April 2021. To accommodate public speaking in these formats, Pennsbury asked speakers to provide their commentary in writing, to be read into the record at the meeting. At times, speakers were allowed to attend meetings to read aloud their comments selected for presentation; at other times, speakers could not physically attend, but comments selected for presentation were displayed on screen and read aloud into the record by the board. The comment submission period typically opened 48 hours prior to the hearing at which they would be read.

39.   Plaintiff Robert Abrams submitted a variety of written comments during this period, many of which were critical of Pennsbury, its school board, and various Pennsbury personnel. Abrams criticized the changing procedures for public participation in the virtual format,

complaining that the board had unfairly reduced the opportunities to speak; called for the removal of Defendants Amuso and Clarke and the resignation of Defendant board members; recommended a replacement for a school board member who had resigned; criticized Pennsbury's declining enrollment and test scores, especially in light of its increasing staffing; criticized a school board member for calling for the appointment of, specifically, a Democrat for a non-partisan position; criticized the public's lack of input into the budget process; accused the board of financial malfeasance; and voiced opposition to the candidacy of two individuals vying for the superintendent's position.

40.    On July 30, 2020, Abrams emailed Defendant T.R. Kannan, who was then serving as President of the Pennsbury School Board, to express his concerns that Pennsbury's public comment policies violate the First Amendment and demand that any of his forthcoming comments be read verbatim into the record. Kannan replied by email the same day, "I will be glad to read your comments as long as it is not personally directed, abusive, obscene or irrelevant."

41.    At the board's December 3, 2020, meeting, in apparent response to Abrams' ongoing criticism, Toy-Dragoni commented on what she

14

perceived as personal attacks. Clarke stated that some of the public comments violate Policy 903 as they are "personally directed," and that the presiding officer can terminate such comments. Given the written nature of comments at the time owing to pandemic restrictions, Clarke suggested that Pennsbury implement Policy 903 as a prior restraint, reviewing all comments before the meeting and then editing or entirely excluding comments deemed to violate Policy 903.

42.    Defendant Toy-Dragoni suggested that Pennsbury review public comments ahead of board meetings and give speakers the opportunity to bring their non-compliant speech into compliance with Policy 903.

43.    Defendant Clarke asserted that the First Amendment does not protect any speech that violates "reasonable guidelines," such as speech calling government officials "criminal" or "incompetent."

> I know that very often during public comment people like to throw around this idea about their First Amendment rights [but] public comment does not allow and the First Amendment does not allow anyone to say anything that they want, and the law is very clear that we are allowed to set reasonable guidelines . . . when they begin with personal attacks and they begin to talk about 'the criminal behavior of this department' or 'how incompetent this one is,' that begins to violate our policy, and we're well within our rights to edit those or to possibly not read them in their entirety.

15

44.    Defendant Goldberg recommended that offensive comments not be read into the record.

45.    Plaintiffs Abrams and Tim Daly each submitted comments to be read at the board's public meeting of December 17, 2020. The guidelines for public comment at the meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items."

46.    Daly's comment for December 17, 2020, criticized board members for filling board vacancies "with controlled votes of members of their preferred political party." He claimed that "these actions to eliminate diversity of thought on the Board and reject the will of the voters has sent the school district into a downward spiral." Daly warned that Pennsbury could be sent "spiraling further into disarray with an incompetent Board that is bereft of leadership." Daly called the board to fill a board vacancy with a candidate who had narrowly lost his election, but doubted that this would happen, owing to conflicts of interest and "lack of leadership." Daly's comment was neither posted online nor read, although Defendant Pennsbury subsequently disclosed its receipt of the comment in a response under Pennsylvania's Right-to-Know law.

16

47.    Abrams' comment for December 17, 2020, criticized Defendant Clarke and the school board for "attempting to silence the public." "You people CHOSE to be public officials. If you are unwilling or unable to deal with public criticisms then I might suggest that you take a lesser position or that you get out of your profession entirely and immediately." Abrams stated that Pennsbury performed poorly, academically and financially, accused the board of violating First Amendment rights, and accused Defendant Waldorf and others of financial improprieties. Abrams' comment was neither posted online nor read, and not made part of Pennsbury's record.

48.    On January 21, 2021, at 2:52 p.m., Daly submitted written public comments to be read at the Pennsbury School Board's meeting that evening. The guidelines for public comment at the meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items." Daly's comments stated that the board "showed a lack of leadership" with respect to the search for a new superintendent, of the sort that previously triggered EEOC complaints and an FBI investigation. He criticized the posted job description, Pennsbury's alleged refusal to

17

learn from feedback gathered in surveying the community, the "rushed" timeframe for conducting the search, and the consideration of internal candidates.

49.   Later that day, at 3:28 p.m., Defendant Langtry emailed Daly back, stating, "your comment has been declined for being personally directed, abusive, obscene, and/or irrelevant. If you wish, you may revise your comment to comply with Board Policy 903 and resubmit it by 4:00 p.m."

50.   On January 21, 2021, at 1:20 p.m., Abrams submitted written public comments to be read at the Pennsbury School Board's meeting that evening. Abrams' comments took issue with an auditor's report, accused Pennsbury of financial mismanagement, criticized Pennsbury for declining enrollment, and blamed Defendants for depressing property values.

51.   Later that day, at 3:25 p.m., Defendant Langtry emailed Abrams back, stating, "your comment has been declined for being personally directed, abusive, obscene, and/or irrelevant. If you wish, you may revise your comment to comply with Board Policy 903 and resubmit it by 4:00 p.m."

52.     One hundred and sixteen people, including Abrams and Daly, submitted public comments for the Pennsbury School Board's February 18, 2021 meeting. The guidelines for public comment at the meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items."

53.     The comments were nearly uniformly critical of Pennsbury's failure to fully reopen the schools considering progress made against the Covid pandemic, often comparing Pennsbury unfavorably to other school districts and expressing the hardships faced by families impacted by the schools' closures.

54.     Abrams' comment, however, criticized Defendants' censorship, alleged financial improprieties, called for new auditors, and argued that Pennsbury's declining enrollment signaled that the district was carrying too many employees. Daly's comments claimed that deposition testimony related to discrimination lawsuits involving Pennsbury "brought shame to our community and has confirmed our worst fears of internal disarray that has left the district incapacitated and unable to operationally function as normal." Daly suggested that Pennsbury settle

the discrimination lawsuits, immediately terminate the superintendent, suspend the superintendent search, and undertake other reforms.

55.   At the meeting, Toy-Dragoni claimed that the school board had planned on allowing people to present their comments in person, but decided to close the building owing to snow. Unlike the practice during previous meetings that the public could not attend, not one of the 116 comments submitted by members of the public for the February 18, 2021, meeting was read aloud. Toy-Dragoni merely stated that the board had read the comments.

56.   On March 4, 2021, Abrams submitted written public comments to be read at the Pennsbury School Board's meeting that evening. The guidelines for public comment at the meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items." Abrams' comments criticized the school board and its solicitors for censoring speech. But for the most part, Abrams' comments criticized Pennsbury's Business Manager, Christopher Bednik. Abrams referenced Bednik's discussion, as an elected member of the Centennial School District, of that district's "Contingency Fund." Abrams called it a "slush fund," and asked that

Bednik reveal any similar use of Pennsbury's money. Abrams otherwise took issue with Bednik's assessment of Pennsbury's employment plans relative to its enrollment, and criticized a tax increase proposed by Bednik and the board as being "as bogus and fraudulent as United States currency produced in someone's basement."

57.    Later that day, at 4:36 p.m., Defendant Langtry emailed Abrams back, stating, "In accordance with Board Policy 903, *Public Participation in Board Meetings*, your comment has been declined for being personally directed, abusive, obscene, and/or irrelevant."

*Defendants' Censorship of Douglas Marshall's Public Online Speech*

58.    Pennsbury is no stranger to the political debate concerning the role of group-identity in education. On February 18, 2021, Defendant Pennsbury, by and through its school board, adopted an "Equity Vision Statement," declaring that "educational equity . . . will serve as the foundation of all decision-making to ensure equitable outcomes for every learner." Pennsbury's statement defines "educational equity" as "the practice of distributing resources, access, and opportunity based on fairness and justice regardless of race, ethnicity, color, age, religion, gender, gender identity, gender expression, sexual orientation,

language, disability, or socio-economic status." Pennsbury has appointed an official, Defendant Gibson, tasked with policing "equity."

59.     Americans, including residents of Pennsbury's constituent townships, hold and express diverse opinions as to what "fairness and justice" may require; whether "resources, access and opportunity" are always "distributed" or perhaps earned; whether, in any given official decision, race or the other listed factors are in fact considered; and whether "equity," however defined, should be a foundational or even an appropriate consideration in official decision-making.

60.     Pennsbury allowed members of the public to speak at its March 18, 2021, online and limited in-person school board meeting. The guidelines for public comment at the meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items."

61.     As Policy 903 appeared on the screen during this meeting, Defendant Toy-Dragoni opened the public comment period by stating that "[t]he policy is on your screens right now and so just keeping in mind that we are adhering to our policy guidelines and enforcing with the option to mute anyone who is in violation of that policy."

62.     Plaintiff Douglas Marshall addressed the board during the public comment period. He questioned whether "we should be implanting in the students' minds this idea that America is inherently racist." He also rejected teaching that "white people have a proclivity toward racism." Marshall opined that Defendant Gibson had inverted Martin Luther King's message of colorblindness at a recent discussion concerning "equity."

63.     Marshall asserted that children are being "handicapped" by being taught that "they are either victims or victimizers," creating a divisive wedge between students. Marshall noted that ours is a diverse country, and he did not wish to see students walking school hallways and feeling guilty about the color of their skin.

64.     Marshall then offered some historical claims:

> [H]istorically, quite frankly, it's the Left that's always been problematic regarding race, only the Left owned slaves. And then we had the Emancipation Proclamation, to which the Left responded with a terrorist group known as the Ku Klux Klan, and legislatively the Jim Crow laws which disenfranchised black people. We had Margaret Sanger, who created the American Eugenics Society, which eventually became Planned Parenthood . . . LBJ created the Great Society which incentivized the destruction of many black families, the Clinton Crime Bill, which created much larger penalties for possession of cocaine among young black men . . . I don't think in any way that Republicans are innocent . . .

23

65.    Marshall then stated, "What we're really talking about here is, what's the proper approach in teaching our children . . .  I think it's a very complex issue, and I don't think it can be approached through the prism of diversity, equity and inclusivity . . ."

66.    Marshall continued,

In 2019 FBI statistics showed that only 9 unarmed black men were killed by police and 19 unarmed white men.  The point I'm making is that that's not focused upon by the media so people don't really focus upon that.  You have thousands of young black men who are being shot and some killed in inner cities but the media doesn't focus on them.  We are not going to resolve that in fact we're going to exacerbate that problem with a curriculum like this.

67.    Referencing the Pledge of Allegiance's homage to an "indivisible" nation, Marshall added, in reference to the "equity" policy, "that's not what we're doing here."

68.    Marshall continued, "This is a highly complex issues, I don't think I have the answers," but called upon the board to consider the approach to civics education endorsed by Florida Governor Ron DeSantis or other educational approaches "because I just don't think this is going to be a way to resolve the divisions that we see, I think we're hurting the students, and creating guilt and victims and victimization, which is not productive for them."

69.    Two days later, Defendant Gibson emailed Toy-Dragoni and Pennsbury Superintendent William Gretzula to condemn Marshall, demand that his speech be removed from the meeting's public record, and advocate for real-time censorship of comments alleged to violate Policy 903.

70.    After extolling the alleged virtues of Pennsbury's "equity, diversity and inclusion work," and lauding the board's support of that effort, Gibson declared that Marshall's speech was "offensive and abusive." With no apparent sense of irony, Gibson wrote, "I do not believe the Pennsbury School District agrees with [Marshall's] viewpoint" that "the equity, diversity and inclusion work is divisive." Gibson also rejected Marshall's assertion that Dr. King's famous hope that individuals would "'not be judged by the color of their skin but by the content of their character' equates to a belief or endorsement in a colorblind approach to social justice."

71.    But although Gibson asserted that "Mr. Marshall is entitled to express his contradictory viewpoint [about the divisiveness of 'equity' and Dr. King] publicly under our School Board policy," she did not extend this understanding to Marshall's "beliefs and ideas" that she

asserted "were abusive and harmful to Black students and families, as well as our community as a whole."

72.   Gibson alleged that Marshall used "coded, racist terms, also known as 'dog whistles'" that "are seemingly innocuous speech often not noticeable to some, but explicitly communicate a more insidious and abusive message to a subset of the audience, in this case black and brown students and community members."

73.   According to Gibson, Marshall's historical discourse and discussion of police killings and inner-city violence "are filled with microaggressions, as well as explicitly racist ideas." Gibson alleged that Marshall's speech

> connect[ed] the Black community to several commonly-held, stereotypical beliefs that are harmful: Black people as inferior, criminals, drug users and as a people who have higher rates of abortion. All of these comments are abusive; none of the comments are relevant to the work taking place in the Pennsbury School District.

74.   Gibson declared that Marshall's speech "should have been ended" when it began offending her, because it was, in her view, "abusive to Black students and community members, as well as irrelevant to any work that is currently taking place in the Pennsbury School District."

75.    Gibson asked that the YouTube link to the board meeting's recording be disabled pending review for the recording's "compliance" with Policy 903; that Marshall's "abusive and irrelevant" public speech be "remove[d]" "so that any subsequent audio or video posting of the meeting does not include his abusive comments;" and that Pennsbury consider an "'in the moment' process/procedure for determining what/when comments should be considered abusive, irrelevant, or otherwise in conflict with" Policy 903. Gibson expressed concern that the board's real-time censor "have the needed capacity to recognize racial and cultural dog whistles that are abusive to subsets of our community."

76.    Toy-Dragoni replied to Gibson later that afternoon via email, claiming that criticism of her speech-restrictive policies had "cloud[ed] my judgment in the moment," leading to her "failure" in "not stopping Mr. Marshall and his abusive comments." "I apologize to all of our community who had to hear that because I was too weak to shut him down!"

77.    Toy-Dragoni wrote that she would make a public statement "acknowledging my failure to protect our community from Mr.

Marshall's abuse." She offered her full support of Gibson's suggestions, and again apologized: "I had mute capability and I didn't use that. I am sorry to you and to all that I did not." Toy-Dragoni continued, "I will work on my statement with the solicitors [Defendants Clarke and Amuso] and would appreciate your approval as well."

78.    Gibson replied to Toy-Dragoni, with copies to Defendant Clarke and Pennsbury Superintendent Gretzula, thanking her for her "willingness to take steps to repair the harm of Mr. Marshall's comments through a public statement." Referencing an upcoming "District Equity Leadership Team Meeting," Gibson declared her belief that "our collective views (you, Dr. Gretzula, and I) on the comments align and will enable us to respond to any potential discussion in an authentic manner that acknowledges our journey towards cultural proficiency and moves the conversation forward."

79.    Meanwhile, Langtry followed Gibson's direction to censor Marshall's disapproved viewpoints. On March 21, 2021, she emailed Gibson and Gretzula, stating that "[w]e have completed the Board meeting edit as discussed and posted the audio on our site. The video should be ready by tomorrow."

80.   The original recordings of the March 18, 2021 Pennsbury
School Board meeting were indeed replaced with edited versions in
which Marshall's historical references, his statements that identity
issues present "a very complex issue" that cannot be "approached
through the prism of diversity, equity and inclusivity," his discussion of
violence and media, his statement that Pennsbury's "equity" initiatives
contradict the Pledge of Allegiance's reflection of an "indivisible" nation,
his calls for the Board to consider alternative approaches to civics
education, and his statement that the "equity" initiative will not resolve
divisions but only hurt students—were all excised.

81.   Only Marshall's last words, "thank you," were appended to the
first portion of his speech, such that the recordings gave the impression
that Marshall did not speak further beyond the speech that Gibson
deemed acceptable. As Marshall's words on the video ended, a
disclaimer on the video stated, "A portion of this recording was edited
due to content."

82.   Gibson drafted an official response to Marshall's speech to be
issued by Toy-Dragoni and the rest of the board. Based on a

29

combination of her initial email to the board and Toy-Dragoni's

response, Gibson marked a space for Toy-Dragoni

> to insert apology for not muting the abusive, irrelevant comments.
> This is where the idea of silence/neutrality as complicity may fit in.
> Also a line about any future comments being muted/ended as needed
> as part of the Board President's responsibility to protect the
> community from harm.

83.    On March 31, 2021, Toy-Dragoni released an official statement

on behalf of Pennsbury referencing Marshall's speech as "abusive and

irrelevant" to Pennsbury's work. "Some of these comments contained

micro-aggressions as well as explicitly-racist ideas that connected the

Black community to several commonly-held, stereotypical beliefs that

are harmful." The statement repeated Gibson's assertions that Marshall

expressed "beliefs and ideas that were abusive and coded in racist

terms, also known as 'dog whistles," which are "seemingly innocuous"

but "insidious and abusive" to minorities.

84.    Toy-Dragoni apologized for not muting Marshall "in the

moment."

> I believe this error in judgment was a response to the recent
> criticism I have received regarding public comment. I let those
> criticisms cloud my decision making, and regretted it
> immediately. The community deserves better, and I resolve to
> do better. Silence is a form of complicity and I want to make
> clear that I am not complicit and as such will not be silent.

> Going forward, I hope that all of us charged with working for our students and community will call out these types of statements or behaviors whenever we see or hear them.

85.     Toy-Dragoni's statement concluded by announcing that Marshall's "inappropriate comments have been edited from the posted recording of the March 18th Board meeting."

86.     Defendants' statement attacking Marshall apparently re-enforced a culture of hostility to First Amendment rights at Pennsbury. For example, Pennsbury employee Damari Fallarco emailed Defendant Langtry on March 31, 2021, in reference to Marshall's speech, "I was taken aback on 3/18 by the entire commentary and in disbelief this was not removed or immediately stopped as it was happening." Defendant Gibson approves of and shares these expectations. She responded to Fallarco's unconstitutional expectations by noting in a responsive email, "Thanks for sharing. Damari is an important voice in our school community." Presumably, voices deemed *un*important by Gibson are the ones that would be "removed or immediately stopped."

87.     Following public outcry, however, Pennsbury restored the unexpurgated recording of its March 18, 2021, school board meeting, albeit with a disclaimer providing:

The following video is unedited. It contains public comment, as well as actions by the public, that are a violation of Pennsbury School Board Policy 903. The posting of this unedited video by the Pennsbury School District does not mean the endorsement of, or agreement with, any statement or action by any member of the public.

*Defendants' Censorship of Marshall, Abrams, and Daly*
*at the May 20, 2021, School Board Meeting*

88.   The guidelines for public comment at the Pennsbury's May 20, 2021, school board meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items." The agenda included a presentation on "equity" by Defendant Gibson, and the board's vote adopting Policy 832, "Educational Equity."

89.   Defendant Amuso acted as the enforcer of Policy 903 during the public comment period. Speaking at the public comment period, Tim Daly responded to school board members' statements about "equity" which were made at the previous board meeting. The following exchange ended Daly's speech:

> Daly:     Board members misrepresented facts around equities in schools, presented unindexed statistics that have no reflection on Pennsbury . . .

| | |
|---|---|
| Amuso | You know what? I'm going to stop you there. We're not going to tolerate misrepresentation of facts around equity. So, it's irrelevant and you can stop. |
| Daly: | In your opinion. |
| Amuso: | No, you can stop, Mr. Daly, you're done. |
| Daly: | You sure you want to do that, Mr. Amuso? |
| Amuso: | Yes, I do. |
| Daly: | Alright, we'll see you in court, sir. Just a reminder, you didn't . . . |

At this point, as Daly was gathering his things, leaving the microphone, and trying to make one last comment, Amuso shouted, "I said you're done! I said you're done! Mr. Daly, sit down!"

90.    Douglas Marshall was next to speak. He also attempted to discuss the topic of "equity," but Defendants Waldorf and Amuso censored Marshall before he could complete his first sentence.

| | |
|---|---|
| Marshall: | At the last meeting, the equity and critical race theory audit was reviewed, and the crux of that was that there were different— |
| Waldorf: | I apologize. It's not what it's called. That is not-- |
| Marshall: | That's how I'm addressing it and I-- |
| Waldorf: | That's not what it's called. |
| Marshall: | That's what I'm calling it. |

Amuso:          Then your comments are irrelevant then if you're not going to call it by the right term.

As Marshall tried to speak, Amuso continued speaking over him,

shouting, "It's the equity policy! It's the equity policy!"

91.    Marshall got a word in: "Alright, I'm telling you what I think it

is, but if you'd like I'll use your term, although I disagree with it, fair

enough?" Amuso allowed him to continue: "Equity policy, go ahead."

92.    Marshall continued, but Amuso soon censored him again,

loudly shouted him down, and terminated his speech—all because

Marshall criticized Pennsbury's "equity" curriculum, the subject of

Gibson's presentation and the board's vote at the very same meeting:

Marshall:       The curriculum that's being used here in Pennsbury, diversity, inclusivity and equity, and it's known by other phrases nationwide, often cherry-picks facts to create what I feel is a predetermined narrative which again, stigmatizes certain groups of people. And yet there are many facts that are not included in the curriculum which I think just aren't included because they don't fit the official narrative.

For example, first-generation Nigerian immigrants excel to the top of the academic socio-economic ladder of success, or—

Amuso:          Alright, alright, we're just, you're getting into irrelevancies, we're just going to stop you, you're done.

93.   Marshall attempted to explain why his speech was relevant, but Amuso kept shouting "You're done!" – eleven times in all. Marshall explained that he was not, in fact, done, but Amuso would not allow him to speak, repeatedly shouting "You're done!" An incredulous Marshall asked, "Based on what?" Amuso replied, "Board Policy 903, you're now being disruptive and disorderly, you're done! You're finished!"

94.   At no time was Marshall disruptive or disorderly. Unlike Amuso, he did not raise his voice, and was often barely audible owing to Amuso's performance. And while Marshall objected to Amuso's behavior, he complied with Amuso's unlawful order to leave.

95.   Next up was Robert Abrams. He, too, was quickly censored for attempting to express a viewpoint critical of the "equity" policy. Referencing a poll about the policy sent by Pennsbury, Abrams stated, "Sixty-five percent are extremely happy now, 27% were neutral, 8% were unhappy. So we're going to build a multimillion dollar program for the 8% that are unhappy. I'll bring the 8% in here, let them meet with-" And then Amuso interrupted, shouting:

> You're done! You're done! We're not, we're not going through this again, Mr. Abrams, that is not what the equity program is about.

35

We're not going to sit here and listen to you. You're done! You're done! You're done.

96.  Abrams began collecting his things and chuckled, "Honestly, after what you did to the last two [speakers], I think you are." As Abrams stood up, and stated, as he was leaving, that he had also wanted to discuss the budget, Amuso continued, "You're done, you've already violated the board policy, according to the policy, your public comment has been terminated."

97.  At the conclusion of the public comment period, having kicked out Daly, Marshall, and Abrams for expressing viewpoints critical of Defendants' favored "equity" policy, the board considered the "civility policy" that would become Policy 922. Superintendent Gretzula opined that "Our leaders cannot sit at the table and deal with harassment from ten feet away. That's why the civility policy is important."

98.  Defendant Wachspress thanked Amuso for censoring and expelling Daly, Marshall, and Abrams.

99.  Defendant Palsky responded, "Well put."

100.  Defendant Kannan said he was "glad" that the board expelled the three citizens.

101.  Defendant Waldorf stated that he was "naïve" to welcome public participation at board meetings, but that he was "embarrassed" and "proven wrong" considering plaintiffs' speech. Waldorf apologized to Defendant Gibson for subjecting her "equity" work to public criticism. He wanted to "involve the public," but "learned a valuable lesson." And with that, Waldorf called for a vote on the "civility policy," which Defendants passed unanimously.

*Defendants' Disruption of Campbell's Speech*
*at the June 17, 2021, School Board Meeting*

102.  The guidelines for public comment at the Pennsbury's June 17, 2021, school board meeting provided, "[A]n opportunity is offered at this time for members of the public to make comment on agenda and non-agenda items." Item "KKK" on the agenda was the proposed amendment to Policy 903 forcing speakers to choose between speaking on agenda or non-agenda items.

103.  Plaintiff Simon Campbell criticized Policy 903 and the school board, whom he called "snowflakes" for their implementation of the policy. With reference to the policy, he addressed "School Board President Benito Mussolini," and lambasted the board for violating First Amendment speech rights.

104.  Defendant Clarke, acting as the enforcer of Policies 903 and 922 at the public comment period, loudly interrupted and began speaking over Campbell, warning him that "if you make personal insults like that again, or if you personally direct your comments will be asked to step away from the podium . . . do not do name-calling like you just did." Campbell quoted Supreme Court precedent to support the proposition that "I don't have to be nice to you, nobody behind me has to be nice to you," and continued with his remarks.

* * *

105.  Accordingly, each individually-named defendant has either perpetuated the censorship of Plaintiffs' speech, personally directed that censorship, or exhibited actual knowledge of and acquiescence in the censorship. Defendant Gibson acted as a prime ringleader: she prescribed Pennsbury's official ideology, decreed which words were heretical, demanded particular censorious action, and served as the focal point of obsequious apology by defendant board members who sought her forgiveness for not suppressing criticism of her views. Defendant Toy-Dragoni confirmed her commitment to censoring disfavored views and apologized for not engaging in more censorship.

38

Defendants Clarke and Goldberg advocated for the censorship of written comments. Defendants Clarke, Amuso, and Waldorf actively silenced Plaintiffs' speech at public meetings. Defendant Langtry intentionally censored written comments, and memory-holed speech that offended Defendants by selectively excising it from the public record. Defendant Kannan declared that he would not read into the record public comments that he felt violated Policy 903. Kannan also expressed satisfaction at the termination of Plaintiffs' speech, as did Defendants Wachspress and Palsky. Each individual Defendant board member was well-aware of the censorship occurring in his or her presence, acquiesced in it, endorsed Toy-Dragoni's commitment to censorship, and supported the adoption of more censorious policies as a reaction to Plaintiffs' speech.

*The Continuing Impact of Defendants'*
*Censorial Policies on Plaintiffs' Speech*

106.  Plaintiffs continue to speak regularly at Pennsbury school board meetings, and at times, to express their views emphatically regardless of Defendants' disapproval. But the threats posed by Policies 903 and 922 do weigh on Plaintiffs, and at times impact their choice of words, the viewpoints they would discuss, and the frequency of their

speech. Plaintiffs fear that at any time, their speech might be edited from public distribution should it cross some arbitrary line, and that at some point Defendants would subject them to negative attention from law enforcement or limit their access to Pennsbury property, including their children's schools. For the same reasons, Section 903 impacts Plaintiffs' choices about whether to bring placards and banners to school board meetings, and what messages to place on such placards and banners. Plaintiffs may at times test the limits of Defendants' speech restrictions, but the restrictions' presence does chill their expression.

107. At some meetings, Defendants strictly enforce the requirement that school board meeting speakers preface their speech by publicly disclosing their home addresses; at other times, speakers can merely state the township in which they reside. When Defendants enforce the practice, each instance of enforcement constitutes an invasion of Plaintiffs' privacy, and weighs upon their decisions to speak about controversial matters.

COUNT ONE

RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO PENNSBURY POLICY 903, SPEECH CONTENT

108.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 107.

109.  The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or initiatives, even if that speech does so in ways that many people may find unpleasant. Allegations of hurt feelings, real or spurious, do not justify censorship of public speech.

110.  Contrary to Defendant Clarke's assertions, the First Amendment's protections extend to public speech at Defendants' school board meetings, by operation of the Fourteenth Amendment.

111.  "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for

41

assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985) (citation omitted). A limited public forum is "a subcategory of the designated public forum." *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 n.2 (3d Cir. 2017) (internal quotation marks omitted).

112.  A school board meeting at which the public is allowed to speak is a designated public forum limited to discussing school operation and governance. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983). Accordingly, content-based restrictions on speech at school board meetings are only permissible to the extent they "confine the forum to the limited and legitimate purposes for which it was created." *Galena v. Leone*, 638 F.3d 186, 199 (3d Cir. 2011) (internal quotation marks omitted). The government may not regulate speech at school board meetings "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (internal quotation marks omitted).

113.  Courts have referred to "limited public forums" and "nonpublic forums" interchangeably, and there is at times some uncertainty as to

the distinction, if any, between these categories. *Porter v. City of Philadelphia*, 975 F.3d 374, 386 n.75 (3d Cir. 2020). A nonpublic forum is "a space that is not by tradition or designation a forum for public communication." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). The government may reserve such a space "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id*. at 1885 (quoting *Perry*, 460 U.S. at 46).

114.  "Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora. So if the government allows speech on a certain subject, it must accept all viewpoints on the subject, even those that it disfavors or that are unpopular." *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 296 (3d Cir. 2011) (citations omitted).

115.  The public comment periods of Pennsbury's school board meetings are limited public fora, to be used by Pennsbury residents and taxpayers to discuss matters of concern related to the school district. When Pennsbury designates comment on "agenda and non-agenda

items," residents and taxpayers may discuss any matter bearing on the school district; when Pennsbury designates comment on "agenda items," it limits discussion to matters on the agenda for that meeting.

116.  It is axiomatic that criticism of school officials, school employees, school rules and regulations, school budgets, and school curricula are germane to the business of school boards—regardless of whether school board members want to hear such criticism or believe that it is fair. The First Amendment prohibits the exclusion of these viewpoints from public speech at school board meetings, regardless of the meeting's forum classification.

117.  Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack;" violate the First Amendment right of free speech on their face by impermissibly discriminating against speech on the basis of content and viewpoint. These prohibitions are not designed to designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress ideologies and opinions

44

respecting matters properly before the school board with which Defendants disagree.

118.  In the alternative, if Pennsbury school board meetings are nonpublic fora, Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack;" also violate the First Amendment right of free speech on their face because they are not reasonable regulations that advance the meetings' purposes, but rather serve only to suppress officially disfavored views.

119.  To the extent that Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack," serve any legitimate function, these are substantially overbroad in violation of the First Amendment right of free speech.

120.  By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO PENNSBURY POLICY 903, SPEECH CONTENT

121.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 120.

122.  All of Plaintiffs' public speech at Pennsbury school board meetings that Defendants have censored, including Plaintiffs' in-person and online speech and written submissions, is fully protected by the First Amendment right to free speech.

123.  All of Plaintiffs' public speech at Pennsbury school board meetings that Defendants have censored, including Plaintiffs' in-person and online speech and written submissions, was germane to the school

board's business, including during those times where public comment was limited to agenda items.

124.  At no point did Defendants terminate or censor Plaintiffs' speech on the basis of time, obscenity, or lack of decorum. Rather, Defendants censored Plaintiffs' speech because they disagreed with it.

125.  As-applied against Plaintiffs, Policy 903's prohibitions on personally addressing or questioning school board members; and of speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack," violated and continue to violate Plaintiffs' First Amendment right of free speech by impermissibly discriminating against their speech on the basis of its content and viewpoint. Should Pennsbury's school board meetings be deemed nonpublic fora, these prohibitions were and are not employed as reasonable regulations that advance the meetings' purposes, but rather serve only to suppress disfavored speech.

126.  In violating Plaintiffs' First Amendment rights, the individually named defendants have acted in a manner that was reckless, callous, intentional, or malicious. They have singled out

Plaintiffs for their views, launched spurious allegations of racism against them, conspired to target their speech, and aggressively censored them in an angry and emotional manner that evinces a profound hostility to Plaintiffs' well-established First Amendment rights.

127.  By enforcing these provisions against Plaintiffs, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, including punitive damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
RIGHT TO PETITION, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO PENNSBURY POLICY 903, SPEECH CONTENT

128.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 127.

129. "The right to petition the government is one of the most precious of the liberties safeguarded by the Bill of Rights. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances. Petitioning serves numerous, fundamental interests of petitioners and the government alike. It is essential to freedom, liberty and self-government. Petitions contribute to the public airing of disputes, the evolution of the law, and the use of government as an alternative to force." *Mirabella v. Villard*, 853 F.3d 641, 653-54 (3d Cir. 2017) (internal quotation marks and citations omitted).

130. "A petition may undoubtedly consist of a personal grievance addressed to the government. But petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole. A petition . . . may include an oral grievance." *Id.* at 654 (internal quotation marks omitted).

131.  Public comment periods at school board meetings are fora whose purpose, in large part, is to enable people to exercise their fundamental First Amendment right of petition.

132.  Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack;" violate the First Amendment right to petition on their face by impermissibly prohibiting and limiting petitions on the basis of content and viewpoint. These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress petitions for redress, respecting matters properly before the school board, when Defendants disagree with the petitions and do not wish to have their authority or judgment challenged, and do not wish to have aired any dissenting viewpoints to their rule.

133.  In the alternative, if Pennsbury school board meetings are nonpublic fora, Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally

directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack;" also violate the First Amendment right of petition on their face because they are not reasonable regulations that advance the meetings' purposes, but rather serve only to suppress officially disfavored petitions.

134. To the extent that Policy 903's prohibitions on personally addressing or questioning school board members; and on speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack," serve any legitimate function, these are substantially overbroad in violation of the First Amendment right of petition.

135. By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of

Defendants' unconstitutional customs, policies, and practices; and

attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR
RIGHT TO PETITION, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO PENNSBURY POLICY 903, SPEECH CONTENT

136.  Plaintiffs reallege and incorporate by reference paragraphs 1

through 135.

137.  All of Plaintiffs' public speech at Pennsbury school board

meetings that Defendants have censored, including Plaintiffs' in-person

and online speech and written submissions, is fully protected by the

First Amendment right to petition the government for a redress of

grievances.

138.   As-applied against Plaintiffs, Policy 903's prohibitions on

personally addressing or questioning school board members; and on

speech deemed "personally directed," "abusive," "irrelevant" (as

interpreted by Defendants to mean, not relevant to their views),

"offensive," "otherwise inappropriate," or a "personal attack," violated

and continue to violate Plaintiffs' First Amendment right to petition by

impermissibly discriminating against their petitions on the basis of

their content and viewpoint. Should Pennsbury's school board meetings

be deemed nonpublic fora, these prohibitions were and are not employed as reasonable regulations that advance the meetings' purposes, but rather serve only to suppress disfavored petitions.

139.  By enforcing these provisions against Plaintiffs, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, including punitive damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FIVE
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO PENNSBURY POLICY 922, CIVILITY

140.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 139.

141.  Defendants adopted Policy 922 in reaction to Plaintiffs' speech, to expand the basis for censoring speech at public meetings. For example, when Abrams expressed the disapproved view that the

"equity" policy is a waste of money, Amuso yelled that Abrams had been "disruptive," even though Abrams had spoken in a calm, conversational voice. Amuso cited Policy 903 for the prohibition on "disruptive" speech, but the term only appeared subsequently in Policy 922.

142.  Policy 922's prohibitions of speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," violate the First Amendment right of free speech on their face by impermissibly discriminating against speech on the basis of content and viewpoint. These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress ideologies and opinions respecting matters properly before the school board with which Defendants disagree.

143.  In the alternative, if Pennsbury school board meetings are nonpublic fora, Policy 922's prohibitions on speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," violate the First Amendment right of free speech on their face because they are

not reasonable regulations that advance the meetings' purposes, but rather serve only to suppress officially disfavored views.

144.  To the extent that Policy 922's prohibitions on speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," serve any legitimate function, these are substantially overbroad in violation of the First Amendment right of free speech.

145.  By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT SIX

RIGHT TO PETITION, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO PENNSBURY POLICY 922, CIVILITY

146.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 145.

147. Policy 922's prohibitions on speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," violate the First Amendment right to petition on their face by impermissibly discriminating against speech on the basis of content and viewpoint. These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress petitions for redress, respecting matters properly before the school board, when Defendants disagree with the petitions and do not wish to have their authority or judgment challenged, and do not wish to have aired any dissenting viewpoints to their rule.

148. In the alternative, if Pennsbury school board meetings are nonpublic fora, Policy 922's prohibitions on speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," violate the First Amendment right of petition on their face because they are not reasonable regulations that advance the meetings' purposes, but rather serve only to suppress officially disfavored petitions.

149.  To the extent that Policy 922's prohibitions on speech deemed "offensive," "inappropriate," "intolerant," "disruptive" (as interpreted by Defendants to mean viewpoints they find offensive), and "verbally abusive," serve any legitimate function, these are substantially overbroad in violation of the First Amendment right of petition.

150.  By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT SEVEN
CONSPIRACY TO VIOLATE CIVIL RIGHTS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

151.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 150.

152.  The individually-named defendants, Amuso, Clarke, Gibson, Toy-Dragoni, Waldorf, Taylor, Goldberg, Kannan, Wachspress, Pallotta,

Palsky, Sandpress, and Langtry, conspired to violate Plaintiffs' First
Amendment rights of free speech and petition by suppressing, under
color of state law, written and oral public comments reflecting
viewpoints with which they disagreed; and thereafter, acted in
furtherance of that conspiracy by censoring Plaintiffs' speech on the
basis of viewpoint.

153. Defendants' unlawful agreement is reflected, in part, in their
taped conversations of the Pennsbury School Board's December 3, 2020
meeting, where Clarke, Toy-Dragoni, and Goldberg all endorsed a plan
of unlawful censorship, in which the other school board members
apparently acquiesced and ratified; in the series of emails by Gibson
and Toy-Dragoni, agreeing with the apparent acquiescence of the other
named individual defendants to censor speech on the basis of viewpoint;
and in the various statements by Defendants, including Wachspress,
Kannan, Palsky, and Waldorf, thanking Amuso for censoring Plaintiffs.
Acts in further of the conspiracy include Langtry's rejection of written
comments and memory-holing of spoken comments, and the behavior of
Amuso, Clarke, and Waldorf actively shouting down, talking over, and
terminating Plaintiffs' speech on the basis of viewpoint.

154. By conspiring to deprive Plaintiffs of their First Amendment speech and petition rights under color of state law, and thereafter following through and implementing said conspiracy, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the rights to free speech and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages, including punitive damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT EIGHT
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO PENNSBURY POLICY 903, ADDRESS DISCLOSURE

155. Plaintiffs reallege and incorporate by reference paragraphs 1 through 154.

156. The right to speak freely includes the right to not speak. "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content

of messages expressed by private individuals." *Turner Broad. Sys. v.*

*FCC*, 512 U.S. 622, 641 (1994) (citations omitted).

157.  Pennsbury's requirement that speakers at public comment

periods preface their remarks by announcing their home address only

appears content-neutral. Enforcement of this requirement is meant to

intimidate speakers who would express controversial views. To be sure,

verifying a speakers' address may advance Pennsbury's interest in

limiting public comment access to its residents and taxpayers. But there

is no need to require that speakers publicly announce their address, and

direct potential reprisal to their homes. Even if the address

announcement requirement is content-neutral, it is not properly

tailored to advancing any government interest.

158.  By enforcing this provision, Defendants, under color of law,

deprive Plaintiffs of the right of free speech in violation of the First and

Fourteenth Amendments to the United States Constitution. Plaintiffs

are thus damaged in violation of 42 U.S.C. § 1983, and are therefore

entitled to damages; declaratory and preliminary and permanent

injunctive relief against continued enforcement and maintenance of

Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT NINE
VAGUENESS, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
PENNSBURY POLICY 903

159.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 158.

160.  As notice is the first element of due process, the Fourteenth Amendment guarantee of Due Process prohibits the enforcement of vague laws. The First Amendment likewise forbids the enforcement of laws that, however valid their application may be in some instances, are so vague as to chill protected speech.

161.  Policy 903's prohibitions of speech deemed "personally directed," "abusive," "irrelevant" (as interpreted by Defendants to mean, not relevant to their views), "offensive," "otherwise inappropriate," or a "personal attack," are each unduly vague, serving only to authorize Defendants' arbitrary censorship of speech they dislike.

162.  By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs

are thus damaged in violation of 42 U.S.C. § 1983, and are therefore

entitled to damages; declaratory and preliminary and permanent

injunctive relief against continued enforcement and maintenance of

Defendants' unconstitutional customs, policies, and practices; and

attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TEN
VAGUENESS, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
PENNSBURY POLICY 922

163.   Plaintiffs reallege and incorporate by reference paragraphs 1

through 162.

164.   Policy 922's prohibitions of speech deemed "offensive,"

"inappropriate," "intolerant," "disruptive" (as interpreted by Defendants

to mean viewpoints they find offensive), and "verbally abusive," are

each unduly vague, serving only to authorize Defendants' arbitrary

censorship of speech they dislike.

165.   By enforcing these provisions, Defendants, under color of law,

deprive Plaintiffs of the right to free speech in violation of the First and

Fourteenth Amendments to the United States Constitution. Plaintiffs

are thus damaged in violation of 42 U.S.C. § 1983, and are therefore

entitled to damages; declaratory and preliminary and permanent

injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing

    a. Pennsbury School Board Policy 903's prohibitions of speech deemed "personally directed," "abusive," "irrelevant," "offensive," "otherwise inappropriate," or a "personal attack;"

    b. Pennsbury School Board Policy 922's prohibitions of speech deemed "offensive," "inappropriate," "intolerant," "disruptive," and "verbally abusive;"

    c. Pennsbury School Board Policy 903's requirement that speakers at public comment periods preface their remarks by announcing their address;

2. Declaratory relief consistent with the injunction, to the effect that Pennsbury School Board Policies 903 and 922's speech prohibitions are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague laws; and that Pennsbury School Board Policy 903's address disclosure rule violates the First Amendment right of free speech;

3. An award of nominal damages to Plaintiffs in the amount of $17.91;

4. Against Defendants Amuso, Clarke, Gibson, Toy-Dragoni, Waldorf, Taylor, Goldberg, Kannan, Pallotta, Palsky, Sanderson, Wachspress, and Langtry, an award of punitive and exemplary damages to Plaintiffs;

5. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

6. Any other relief as the Court deems just and appropriate.

Dated: October 1, 2021                    Respectfully submitted,

                                   By:   /s/ Michael Gottlieb
Alan Gura*                               Michael Gottlieb
Endel Kolde*+                              PA Bar No. 36678
Martha Astor*+                           VANGROSSI & RECHUITTI
INSTITUTE FOR FREE SPEECH                319 Swede Street
1150 Connecticut Avenue, N.W.            Norristown, PA 19401
Suite 801                                610.279.4200
Washington, DC 20036                     mikem1a1@aol.com
202.301.3300
agura@ifs.org
dkolde@ifs.org
mastor@ifs.org

   *  Application pro hac vice pending
   +  Not yet admitted to D.C. Bar,
      Supervised practiced per D.C. Ct. Appeals R. 49(c)(8)