IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DOUGLAS MARSHALL, et al.,          :          Case No. 2:21-cv-04336 GEKP

           Plaintiffs,          :

           v.          :

PETER C. AMUSO, et al.,          :

           Defendants.          :


PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................ 2

SUMMARY OF ARGUMENT ............................................................................... 9

ARGUMENT .................................................................................................... 9

    I.    PLAINTIFFS WILL SUCCEED ON THE MERITS ................................... 10

          A.    *The First Amendment forbids Defendants from discriminating against speech and petitions at school board meetings on the basis of viewpoint.* ........................ 10

          B.    *Defendants endorse and celebrate flagrant viewpoint discrimination.* ................................................................... 12

          C.    *Key terms in the Policies 903 and 922 are incapable of reasoned application and invite subjective viewpoint discrimination.* ................................................................... 14

          D.    *Policies 903 and 922 are vague and invite self-censorship.* ........................................................................... 15

          E.    *Policies 903 and 922 are overbroad.* ................................. 16

          F.    *The address-disclosure provision of Policy 903 amounts to a compelled disclosure that is not reasonably related to the purposes of the forum.* ............................................. 17

    II.    THE VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS INFLICTS IRREPARABLE HARM. ........................................................ 18

    III.    ENFORCING THE FIRST AMENDMENT IS IN THE PUBLIC INTEREST.. 18

    IV.    THE COURT SHOULD WAIVE RULE 65(C)'S BOND REQUIREMENT. ..... 18

CONCLUSION ............................................................................................... 19

TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales,*
    478 F. Supp. 2d 775 (E.D. Pa. 2007) ...................................................................... 16

*Am. Freedom Def. Initiative v. SEPTA,*
    92 F. Supp. 3d 314 (E.D. Pa. 2015) ....................................................................... 18

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ............................................................................................... 10

*Ctr. for Investigative Reporting v. SEPTA,*
    975 F.3d 300 (3d Cir. 2020) ............................................................................ 14, 18

*Eichenlaub v. Township of Indiana,*
    385 F.3d 274 (3d Cir. 2004) .................................................................................. 10

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................... 18

*Galena v. Leone,*
    638 F.3d 186 (3d Cir. 2011) ........................................................................ 10, 11, 15

*Gibson v. Mayor & Council of Wilmington,*
    355 F.3d 215 (3d Cir. 2004) .................................................................................. 16

*Greater Phila. Chamber of Commerce v. City of Phila.,*
    949 F.3d 116 (3d Cir. 2020) .................................................................................... 9

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) .......................................................................................... 15

*Ison v. Madison Local Sch. Dist. Bd. of Educ.,*
    No. 20-4108, 2021 U.S. App. LEXIS 20111 (6th Cir. July 7, 2021).... 10, 13, 14, 15

*Janus v. AFSCME, Council 31,*
    138 S. Ct. 2448 (2018) .......................................................................................... 17

*K.A. v. Pocono Mt. Sch. Dist.,*
    710 F.3d 99 (3d Cir. 2013) .................................................................................... 18

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................................... 16

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .................................................................................... 13, 15

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) .................................................................................... 14, 18

*Mirabella v. Villard,*
    853 F.3d 641 (3d Cir. 2017) .................................................................................. 10

*Monteiro v. City of Elizabeth,*
    436 F.3d 397 (3d Cir. 2006) ............................................................................ 13

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ......................................................................................... 13

*NAACP v. Button,*
    371 U.S. 415 (1963) ......................................................................................... 13

*NAACP v. City of Phila.,*
    834 F.3d 435 (3d Cir. 2016) ............................................................................ 10

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ........................................................................................... 10

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth.,*
    653 F.3d 290 (3d Cir. 2011) ............................................................................ 11

*Pleasant Grove City v. Summum,*
    555 U.S. 460  (2009) ........................................................................................ 10

*Rosedale & Rosehill Cemetary Ass'n v. Twp. of Reading,*
    510 F. Supp. 3d 250 (D.N.J. 2020) ................................................................. 16

*Rosenberger v. Rector and Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ......................................................................................... 11

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) .................................................................................... 16

*Sypniewski v. Warren Hills Reg'l Bd of Educ.,*
    307 F.3d 243 (3d Cir. 2002) ............................................................................ 16

*United States. v. Tykarsky,*
    446 F.3d 458 (3d Cir. 2006) ............................................................................ 15

*W. Va. State Bd. of Education v. Barnette,*
    319 U.S. 624 (1943) ........................................................................................... 1

*Zambelli Fireworks Mfg. Co. v. Wood,*
    592 F.3d 412 (3d Cir. 2010) ............................................................................ 19

**Other Authorities**

James Lindsay, *Translations from the Wokish,* NEW DISCOURSES,
    https://newdiscourses.com/tftw-inclusion/ (last visited October 7, 2021) ............ 12

James Lindsay, *Translations from the Wokish,* NEW DISCOURSES,
    https://newdiscourses.com/tftw-equity/ (last visited October 7, 2021) ................. 12

Pennsbury Educational Equity Policy, https://bit.ly/3A9WIPY (last visited October
    7, 2021) ................................................................................................................ 12

**Rules**

Fed. R. Civ. P. 65(c) ................................................................................................. 18

INTRODUCTION

*This last was for the disposal of waste paper. Similar slits existed in thousands or tens of thousands throughout the building, not only in every room but at short intervals in every corridor. For some reason they were nicknamed memory holes.*

– George Orwell, *1984*

Discussion about the nature of American society, and the role of schools in shaping students' views and opportunities, constantly occupies our nation's school boards. That Americans disagree about these topics is fine. A spirited debate about equality vs. equity in education is an expected part of living in a politically diverse society.

But "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943). When government officials declare themselves or their policies off-limits to criticism or open discussion, they run counter to the American tradition of free and open debate, and violate the First Amendment rights of speech and petition.

Defendant school board members, officials, and solicitors conspired to violate Plaintiffs' civil rights because they dared criticize the Pennsbury School Board, its members, and its "equity" policy. They furthered and, if not stopped by this Court, will continue to further their conspiracy through a variety of illegal means, including: censoring written comments that diverged from Pennsbury's orthodoxy, memory holing and threatening to mute oral comments critical of their policies, and repeatedly interrupting and cutting short Plaintiffs' public comments that depart from the official narrative. This Court should preliminarily enjoin Defendants' unconstitutional practices and policies. Owing to the importance of the issues at stake, Plaintiffs respectfully request oral argument.

FACTS

*Pennsbury's Public Comment Policies and Practices*

Defendant Pennsbury School District ("Pennsbury") provides that its board "shall provide an opportunity at each open meeting of the Board for residents and taxpayers to comment on matters of concern, official action or deliberation before the Board prior to official action by the Board." Authority, *Public Participation at Board Meetings*, Pennsbury Sch. Dist. Policy Manual § 903 ("Policy 903"). Ex. A. Policy 903 further provides that that speakers at public school board meetings "must preface their comments" by announcing their name and address, and directs them to address only the presiding officer. Speakers may not "address or question Board members individually." Ex. A, Guidelines. The presiding officer may "[i]nterrupt or terminate a participant's statement when the statement is . . . personally directed, abusive . . . or irrelevant." Ex. A, Guidelines. Policy 903 also forbids speakers from bringing banners or placards that are "offensive," "otherwise inappropriate," or "that contain personal attacks." *Id.*

Per Defendant School Board President Christine Toy-Dragoni, "Comments are found in violation of the policy by anyone who hears them and thinks so. It is then run by our solicitors who make the decision that something is in violation." Ex. B (email dated 03/31/2021 at 7:25 PM). Pennsbury's Solicitor, Defendant Clarke has previously told speakers, "you don't have First Amendment rights in here." *Pennsbury Edited Meeting March 14, 2014*, link.ifs.org/NoRights at 0:26-37. In addition to having their comments terminated, those deemed to violate Policy 903 may be removed by law enforcement and barred from being present or speaking at future board meetings. Ex. A, Guidelines.

Pennsbury also maintains a "civility policy" that forbids "[o]ffensive, inappropriate [and] intolerant" speech. Ex. C, Guidelines (Policy 922). Speakers who become "disruptive, abusive" or who otherwise violate this policy may be censored,

referred to law enforcement, and barred from school property. *Id.,* Strategies for Addressing Incivility.

*Defendants' Refusal to Publish Plaintiffs' Written Comments*

Owing to the COVID-19 pandemic, Pennsbury held its school board meetings online, or online with very limited audience capacity, from April 2020 through April 2021. Daly Decl. ¶ 4. To accommodate public speaking, Pennsbury asked that comments be submitted in writing, to be read into the record. *Id*. Speakers could attend some meetings to read their comments; at others, speakers attended virtually, and comments selected for presentation were displayed on screen and read aloud into the record by board members. *Id*. The comment submission period typically opened 48-hours prior to the hearing at which they would be read. *Id*.

Plaintiff Robert Abrams submitted a variety of written comments during this period, many of which were critical of Pennsbury. Ex. D; Abrams Decl. ¶¶ 3, 7. On July 30, 2020, Abrams emailed Defendant school board member Kannan, then the board's president, to express his fears that Pennsbury's public comment policies violate the First Amendment and demand that any of his forthcoming comments be read verbatim into the record. Abrams Decl. ¶ 9; Ex. E. Kannan replied by email the same day, "I will be glad to read your comments as long as it is not personally directed, abusive, obscene or irrelevant." *Id*.

At its December 3, 2020, meeting, Toy-Dragoni offered that she perceived the public's comments as personal attacks. Marshall Decl. ¶ 4; Abrams Decl. ¶¶ 16-19; Ex. F at 9. Clarke stated that some public comments violated Policy 903 as they were "personally directed," and suggested the presiding officer terminate those comments. Pennsbury Sch. Bd. Minutes, https://bit.ly/3owQoQe at 9-10; Ex. F at 9. Clarke asserted that the First Amendment does not protect any speech that labels government officials "criminal" or "incompetent." *Pennsbury*, December 3, 2020 Meeting, https://bit.ly/3mkDh1U at 1:59:52-2:00:40; Adams Decl. ¶ 18. Defendant

3

board member Goldberg added that he believed that offensive comments should not be read into the record at all. December 3 Meeting at 2:01:17 –2:01:45; Ex. F. at 9; Adams Decl. ¶ 19.

Plaintiffs Abrams and Tim Daly each submitted comments critical of Pennsbury and its school board to be read at the board meeting held December 17, 2020. Abrams Decl. ¶ 8; Ex. D; Daly Decl. ¶ 5; Ex. N. Neither Daly's nor Abrams' comment were posted online or read, and not made part of Pennsbury's record. Abrams Decl. ¶ 8; Daly Decl. ¶ 5.

Daly and Abrams submitted written public comments to be read at Pennsbury's January 21, 2021, meeting. Daly criticized the board's search process for a new Superintendent, Daly Decl. ¶ 6; Ex. G; while Abrams criticized the board's performance, and accused it of financial mismanagement, Abrams Decl. ¶ 10; Ex. H.

Defendant Langtry emailed Daly and Abrams, rejecting their comments under Policy 903. Daly Decl. ¶ 6; Abrams Decl. ¶ 10; Exs. G, H. Langtry likewise rejected Abrams's critical comments submitted for the board's March 4, 2021 meeting. Abrams Dec. ¶ 11; Ex. I.

One hundred and sixteen people, including Abrams and Daly, submitted public comments for Pennsbury's February 18, 2021 meeting, that were nearly uniformly critical of Pennsbury. *Pennsbury*, Public Comment Submissions, *https://bit.ly/3Bp0577*. The Board did not read a single comment aloud. Abrams Dec. ¶ 22; *Pennsbury*. February 18, 2021 Meeting, https://bit.ly/3iyVhV7 at 2:06:57-2:07:30.

*Defendants' Removal of Douglas Marshall's Public Online Speech*

Plaintiff Douglas Marshall addressed Pennsbury's school board at its March 18, 2021 meeting, criticizing the "Equity Policy" then in development. *Pennsbury,* March 18, 2021 Meeting, https://bit.ly/3A5f4Bn at 47:30-52:07; Marshall Dec. ¶¶ 6-12. Among other similar statements, he questioned whether "we should be

implanting in the students' minds this idea that America is inherently racist."
March 18 Meeting at 47:30-47:39; Marshall Dec. ¶ 7.

Two days later, Defendant Cherrissa Gibson, Pennsbury's Director of Equity,
Diversity and Education, emailed Toy-Dragoni to condemn Marshall, demand that
his speech be removed from the meeting's public record, and advocate for real-time
censorship of comments alleged to violate Policy 903. Ex. J at 15 (internal email
chain). Gibson alleged that Marshall used "coded, racist terms, also known as 'dog
whistles'" that "are seemingly innocuous speech often not noticeable to some." *Id.* at
15. In this same email Gibson declared Marshall's speech "should have been ended"
when it began offending her, because it was, in her view, "abusive to Black students
and community members, as well as irrelevant." *Id.* at 16.

Gibson then asked that the link to the recording be disabled pending review for
the recording's "compliance" with Policy 903; that Marshall's "abusive and
irrelevant" public speech be "remove[d]" and that Pennsbury consider an "'in the
moment' process/procedure for determining what/when comments should be
considered abusive, irrelevant or otherwise in conflict with" Policy 903. *Id.* Gibson
expressed concern that the board's real-time censor "have the needed capacity to
recognize racial and cultural dog whistles" *Id.*

Defendant Toy-Dragoni replied to Gibson later that afternoon, claiming past
criticism of her speech-restrictive policies had prevented her from censoring
Marshall "and his abusive comments." *Id.* She apologized for being "too weak to
shut him down!" *Id.* at 14. Toy-Dragoni agreed to make a public statement that
would accept the blame for her failure to censor Marshall. She also explained that
she could have muted Marshall and apologized for not doing so. *Id.* Toy-Dragoni
promised to collaborate with Defendants Clarke and Assistant Solicitor Amuso to
formulate Gibson's requested statement and would submit it to her for "approval."
*Id.* Gibson replied by thanking Toy-Dragoni, for her "willingness" to provide the

5

statement Gibson demanded and noted that their "collective views…on the comments align[.]" *Id.*

Meanwhile, Langtry followed Gibson's direction to remove Marshall's disapproved viewpoints. Ex. J at 13. On March 21, 2021, she sent an email stating that she had edited the video "as discussed" and would be ready to post the next day. *Id.* The original recording of the March 18, 2021 Pennsbury meeting was replaced with an edited version in which much of Marshall's speech was excised. *Pennsbury*, Edited Meeting of the Board March 21, 2021, *see* https://link.ifs.org/PennsburyBoardEdit at 45:53-48:03; Campbell Decl. ¶ 5; Marshall Decl. ¶ 14.

Gibson drafted the official response to Marshall's speech and left a space for Toy-Dragoni to insert an apology to the community. Ex. J at 18-19. On March 31, 2021, Toy-Dragoni released the finalized version which became an Official Statement on behalf of Pennsbury referencing Marshall's speech as "abusive and irrelevant" and stating that Marshall had made statements that were "insidious and abusive" to minorities. Marhsall Decl. ¶ 13; Ex. K. Her statement concluded by announcing that Marshall's comments "have been edit from the posted recording of the March 18th meeting." *Id.* Following public outcry, however, Pennsbury restored the unexpurgated recording, albeit with a disclaimer. *Id.* at ¶ 14; Campbell Decl. ¶ 5.

*Defendants' Censorship of Marshall, Abrams, and Daly*
*at the May 20, 2021, School Board Meeting*

The Pennsbury School Board's agenda for its May 20, 2021, meeting included a presentation by Gibson on proposed Policy 832, "Educational Equity," and votes on adoption of Policies 832 and 922. Daly Decl. ¶ 8; Ex. L. When, during public comment, Daly criticized Pennsbury's factual assertions in support of the equity policy, Amuso interrupted him repeatedly, yelled at him, and barred him from

speaking further, yelling, "I said you're done!" May 20, 2021 Meeting, https://bit.ly/3l6BHkF at 1:45:21-1:46:13; Daly Decl. ¶¶ 9-12.

Marshall spoke next. He also attempted to discuss "equity," but Defendants Waldorf and Amuso interrupted Marshall before he could complete his first sentence because they did not want Marshall to describe their policy with the term "critical race theory." May 20, Meeting at 1:47:06-1:47:34; Marshall Decl. ¶¶ 17-20. They allowed Marshall to briefly continue after agreeing to refrain from describing the policy as he saw it and to instead use Amuso's preferred language. *Id.* Amuso soon interrupted Marshall again for criticizing Pennsbury's "equity" curriculum, the subject of Gibson's presentation and the board's vote at the very same meeting. May 20 Meeting at 1:50:18-1:51:30; Marshall Decl. ¶¶ 16-17. Citing Policy 903, Amuso repeatedly shouted "You're done!" at Marshall for having spoken against the policy, falsely stated that Marshall was disruptive and disorderly, and ended by shouting, "You're finished!" May 20 Meeting at 1:45:50-1:51:40; Marshall Decl. ¶ 18.

Amuso then shouted down Abrams's attempt to criticize the equity policy's cost. "You're done! You're done…We're not going to sit here and listen to you." May 20, Meeting at 1:51:55-1:53:03; Abrams Decl. ¶¶ 25-27.

At the conclusion of public comment, having silenced Daly, Marshall, and Abrams for expressing viewpoints critical of Defendants' equity policy, the board enacted the "educational equity" and "civility" policies. May 20 Meeting at 2:01:31-45 (voting on agenda item 7B, *see* Ex. L at 9); *id.* at 2:08:45-2:08:58. Wachspress thanked Amuso for censoring speakers. Marshall Decl. ¶ 20; May 20, Meeting at 2:06:10-2:06:18. Palsky responded, "Well put." May 20 Meeting at 2:06:29-32. Kannan said he was "glad" that the board expelled the three citizens from the microphone. May 20 Meeting at 2:06:33-2:06:49. Waldorf stated that he was "naïve" to welcome public participation at board meetings, and apologized to Gibson for subjecting her "equity" work to public criticism. May 20 Meeting at 2:07:46-2:08:55.

*Defendants' Disruption of Campbell's Speech*
*at the June 17, 2021, School Board Meeting*

At its June 17, 2021, meeting, Pennsbury considered amending Policy 903 to force speakers to choose between speaking on agenda or non-agenda items. Ex. M. Pennsbury's current Policy 903, Ex. A, reflects this amendment. Marshall Decl. ¶ 3 Plaintiff Simon Campbell criticized Policy 903 and the school board. *Pennsbury*, June 17, 2021 Meeting, https://bit.ly/3l9BT2B at 1:28:03-1:32:43; Campbell Decl. ¶¶ 6-7.  Clarke interrupted and spoke over Campbell at length for violating Policy 903 by criticizing the board. June 17 Meeting at 1:30:07-1:32:08; Campbell Decl. ¶¶ 7-8.

*The Continuing Impact of Defendants'*
*Censorial Policies on Plaintiffs' Speech*

Abrams, Marshall, Campbell, and Daly continue to speak at some Pennsbury meetings, but they are more cautious about running afoul of Defendants' speech policies and sometime re-phrase their comments, or avoid speaking altogether. Marshall Decl. ¶¶ 21-23; Daly Decl. ¶¶ 12-13; Abrams Decl. ¶ 28; Campbell Decl. ¶ 10. The threats posed by Policies 903 and 922 do weigh on Plaintiffs, and at times impact their choice of words, the viewpoints they would discuss, and the frequency of their speech. Marshall Decl.¶ 22; Daly Decl. ¶ 12; Abrams Decl. ¶ 28; Campbell Decl. ¶ 10. Plaintiffs fear that at any time, their speech might be edited from public distribution should it cross some arbitrary line, and that at some point Defendants would subject them to negative attention from law enforcement or limit their access to Pennsbury property. Campbell Decl. ¶ 10; Marshall Decl. ¶¶ 21-22.

And while at most meetings, speakers are able to get away with only stating their township of residence, at the June 2021 Pennsbury meeting, the address-announcement policy was strictly enforced. Daly Decl. ¶ 13; Abrams Decl. ¶ 29. Being potentially forced to state their home address when speaking out on controversial issues weighs on Plaintiffs' minds, and inhibits their desire to keep

8

speaking out for fear of reprisal by those who do not tolerate their points of view. Daly Decl. ¶¶ 13-14; Abrams Decl. ¶¶ 29-30.

## SUMMARY OF ARGUMENT

Defendants engage in a pattern of blatant viewpoint discrimination at their school board meetings, censoring views that were critical of the school board or its policies. The documentary, video, and other evidence shows that they discussed, planned, executed, and even celebrated the suppression of views that they found disagreeable, going so far as to erase comments from the public record and shouting-down regime critics. Viewpoint discrimination is always unconstitutional in a limited public forum such as a school board meeting.

Moreover, key terms of Defendants' policies are so subjective and incapable of reasoned application as to invite discriminatory enforcement in the future. For the same reasons, they are also vague and overbroad. Finally, the address-disclosure provision is unreasonable and invites controversial speakers to self-censor.

Defendants have the burden of justifying their viewpoint-discriminatory speech restrictions. Since they cannot do so, irreparable harm is presumed.

## ARGUMENT

[T]he moving party must establish four factors to get a preliminary injunction:

(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) that the public interest weighs in favor of granting the injunction.

*Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (footnote omitted).

Ordinarily, the moving party must establish the first two factors before the last two are evaluated. *Id.* But in "First Amendment cases the initial burden is flipped." *Id.* The government bears the burden of proving the law is constitutional, tracking the burdens at trial. *Id.* Thus, the plaintiff must first make a colorable claim that

the law restricts some form of speech, which shifts the burden to the government. *Id.* The government must then justify the speech restriction under the applicable level of scrutiny. *Id.* If the government cannot meet its burden, then irreparable harm is generally presumed where free speech and petition rights are infringed. *Id.*[1]

I.   PLAINTIFFS WILL SUCCEED ON THE MERITS

   A. *The First Amendment forbids Defendants from discriminating against speech and petitions at school board meetings on the basis of viewpoint.*

Defendants cannot meet their burden because their policies and actions amount to blatant viewpoint discrimination. Government entities create limited public forums when they provide forums that are limited to certain groups and subjects. *Galena v. Leone*, 638 F.3d 186, 197-99 (3d Cir. 2011). In these forums, "[c]ontent-based restrictions are valid so long as they are reasonable *and viewpoint-neutral.*" *NAACP v. City of Phila.*, 834 F.3d 435, 441 (3d Cir. 2016) (emphasis added) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) and *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)) (footnote omitted).

The public comment period of Pennsbury school board meetings is a limited public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 & n.7 (1983); *Ison v. Madison Local Sch. Dist. Bd. of Educ.,* No. 20-4108, 2021 U.S. App. LEXIS 20111, at *6-7 (6th Cir. July 7, 2021) (parties agree that school board meeting is limited public forum); *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) (citizens' forum at township board of supervisors meeting was limited public forum); *Galena,* 638 F.3d at 199 (county council meeting was limited public forum). Defendant Toy-Dragoni called the Pennsbury School Board comment

---

[1] The rights to petition and free speech are not "identical in their mandate or their purpose and effect," but they share "substantial common ground." *Mirabella v. Villard*, 853 F.3d 641, 655 (3d Cir. 2017) (internal quotation marks omitted). Under the circumstances, Speech Clause precedent governs Plaintiffs' petition claims as well. *Id.* at 654-55.

periods limited public forums, and Plaintiffs concur. *Pennsbury,* April 15, 2021 Meeting, https://bit.ly/3oAfSfL at 1:21:50-1:23:02. That is, Defendants may only subject speech and petitions to reasonable time, place, and manner restrictions, and ask that comments be school-related. And they must be viewpoint-neutral; Defendants simply cannot discriminate against speech and petitions based on the views expressed.[2]

It is axiomatic that the government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995). When governments target not just the subject matter, but a speaker's views, "the violation of the First Amendment is all the more blatant." *Id.* "Viewpoint discrimination is thus an egregious form of content discrimination." *Id.*

If the government allows some speech on a certain subject, it *must allow all viewpoints* on that subject, even ones the government may disfavor. *Pittsburgh*, 653 F.3d at 296 (emphasis added). And even a valid time-place-and-manner restriction cannot be applied based on a speaker's viewpoint. *Galena,* 638 F.3d at 199.

Thus, neither the Pennsbury School District, nor its agents or employees may control the terms of the debate about diversity, equity, and inclusion. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger,* 515 U.S. at 831. They also may not insulate themselves from criticism or memory-hole speech with which they disagree.

---

[2] Although some cases describe non-public forums, courts increasingly use the terms non-public forum and limited public forum interchangeably. *NAACP,* 834 F.3d at 441 n.2; *Galena,* 638 F.3d at 197 n.8. Since the legal standards are functionally identical in both forums, Plaintiffs also use the terms limited public forum and non-public forum interchangeably. In any event, the type of forum is irrelevant where viewpoint discrimination is concerned. *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 296 (3d Cir. 2011).

*B. Defendants endorse and celebrate flagrant viewpoint discrimination.*

Notwithstanding the First Amendment's well-established prohibition of viewpoint discrimination, Defendants have promulgated and applied their speech rules to allow only favored views on the topics of diversity, equity, and inclusion[3] to be presented, and to silence criticism generally. Indeed, Defendants not only suppress views they find "offensive," they celebrate their censorship of dissent as though it were some kind of enlightened policy rather a flagrant violation of fundamental rights.

Defendants' most flagrant acts of viewpoint discrimination include:

- Erasing Marshall's speech from the March 18, 2021, meeting recordings because Gibson found Marshall's comments offensive. Ex. J.

- Toy-Dragoni's March 31, 2021, official statement apologizing for not muting Marshall's public comments as "abusive and irrelevant," "dog whistles," and "microaggressions." Ex. K.

- Amuso and Waldorf's repeated interruptions, hectoring, and exclusion of Marshall, Abrams, and Daly at the May 20, 2021 school board meeting,

---

[3] The terms "diversity," "equity," and "inclusion" are themselves contested. *Compare* Pennsbury Educational Equity Policy, https://bit.ly/3A9WIPY (last visited October 7, 2021) (defining "educational equity," "equity lens," "inclusion" and "workforce diversity") *with* James Lindsay, *Translations from the Wokish: Equity,* NEW DISCOURSES, https://newdiscourses.com/tftw-equity/ (last visited October 7, 2021) ("Equity is often sought under a combined suite of 'diversity, equity, and inclusion' (DEI) or sometimes 'justice, equity, diversity, and inclusion' (JEDI), and as such, these terms have become major buzzwords in most professional sectors, particularly including education"); *Id.,* https://newdiscourses.com/tftw-inclusion/ (last visited October 7, 2021) ("[i]nclusion is an expansive concept that could apply to silencing certain ideas like conservatism, meritocracy, or support for freedom of speech, usually in the name of safety and preventing the 'trauma' or 'violence' that such ideas could inflict upon progressives who see them as ideologies that perpetuate systemic harm"). It is ironic that Defendants sought to exclude Plaintiffs' speech in the name of "inclusion."

including repeatedly shouting, "You're done!" Marshall Decl. ¶¶ 16-19; Abrams Decl. ¶¶ 26-27; Daly Decl. ¶¶ 10-12.

- Clarke's interruption and hectoring of Campbell at the June 17 meeting; Campbell Decl. ¶¶ 7-8; and

- Defendants' rejection of Daly and Abrams's written comments. Exs. G-I.

Americans have a fundamental constitutional right to voice criticism of their government institutions and officials, including school boards and school officials. Our constitutional order enshrines a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The Constitution does not countenance happy-talk clauses. *Matal v. Tam*, 137 S. Ct. 1744, 1764-65 (2017). And constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." *Sullivan,* 376 U.S. at 271 (quoting *NAACP v. Button*, 371 U.S. 415, 445 (1963)).

It is obvious that Defendants may not silence, interrupt, or eject speakers for criticizing or offending anyone, including school board members and members of the wider community. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006). Directly on-point stands *Ison,* 2021 U.S. App. LEXIS 20111. There*,* the Sixth Circuit recently held that a school board president who stopped a speaker "when he started offending people" engaged in impermissible viewpoint discrimination. *Ison,* 2021 U.S. App. LEXIS 20111, at *12-13.[4] The video showed a boardmember taking offense at the speaker's comments, but also that the speaker "spoke calmly, used measured tones, and refrained from personal attacks or vitriol, focusing instead on

_____

[4] This was the Sixth Circuit's analysis on the as-applied challenge. The court also facially invalidated particular speech restrictions, which is discussed further, *infra.*

his stringent opposition to the Board's policy and his belief that the Board was not being honest about its motives." *Id.* Defendants' misconduct is no different.

    C.  *Key terms in the Policies 903 and 922 are incapable of reasoned application and invite subjective viewpoint discrimination.*

This Court should facially invalidate significant portions of Policies 903 and 922 because their terms "personally directed," "abusive," "offensive," "otherwise inappropriate," "personal attack," "inappropriate," and "intolerant" are incapable of reasoned application. These terms therefore invite, and have already resulted in, viewpoint discrimination. In addition, this Court should also hold that the terms "irrelevant" and "disruptive" were unconstitutional as-applied to Plaintiffs' speech criticizing the school board and its policies.

In *Minn. Voters All. v. Mansky,* 138 S. Ct. 1876 (2018), the Supreme Court invalidated a state statute prohibiting wearing a political badge, button, or insignia at a polling place because the term "political" was ill-defined and vested too much discretion in election judges who enforced the rule. The court reasoned that it was self-evident that indeterminate prohibitions create opportunities for abuse through open-ended interpretation. *Id.* The election judge's "discretion must be guided by objective, workable standards. Without them an election judge's own politics may shape his views on what counts as 'political.'" *Id.*

Similarly, in *Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300, 313-14 (3d Cir. 2020), the Third Circuit relied on *Mansky* to facially invalidate a transit authority's advertising ban on political ads because it was so open-ended as to be incapable of reasoned application. There, the court criticized "the absence of guidelines cabining SEPTA's General Counsel's discretion," and noted that this might allow the General Counsel's own politics to shape his views on what counts as a political ad. *Id.* at 316. And in *Ison,* the Sixth Circuit facially invalidated a school board's use of vague terms such "antagonistic," "insulting," and "personally

14

directed." No. 20-4108, 2021 U.S. App. LEXIS 20111, at *10-11. "The restrictions on 'antagonistic,' 'abusive' and 'personally directed' speech prohibit speech because it opposes, or offends, the Board or members of the public, in violation of the First Amendment." *Id.* at 12 (citing *Matal* and *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019) (striking down prohibitions of immoral or scandalous trademarks)). After all, "[g]iving offense is a viewpoint." *Matal,* 137 S.Ct. at 1763.

Likewise, this Court should facially invalidate Policy 903's use of the terms "personally directed," "abusive," "offensive," "otherwise inappropriate," and "personal attack;" and the use of Policy 922's use of the terms "offensive," "inappropriate," and "verbally abusive." The terms invite the use of excessive discretion and allow those policies to be used to prohibit criticism and limit discussion of contested ideas, including the role of diversity, equity, and inclusion in education. As Toy-Dragoni emailed a parent, "Comments are found in violation of the [speech] policy by anyone who hears them and thinks so. It is then run by our solicitors who make the decision that something is in violation." Ex. B. But accusing public officials of incompetence is practically the birthright of any American.

The terms "disruptive" and "irrelevant" are not so open-ended as to require facial invalidation. "Disruptive" can apply to physical conduct, and relevance may be a standard that focuses speakers on matters of concern to the school rather than random musings. But Defendants apply these terms to effectuate viewpoint discrimination. Anything they don't wish to hear is "disruptive" to their worldview and "irrelevant" to their conception of the truth. This is not a lawful application of such standards. *Galena*, 638 F.3d at 199; *Ison,* 2021 U.S. App. LEXIS 20111, at *11.

   *D. Policies 903 and 922 are vague and invite self-censorship.*

The vagueness doctrine ensures fair notice and nondiscriminatory application of the laws. *United States. v. Tykarsky,* 446 F.3d 458, 472 n.9 (3d Cir. 2006). A statute or regulation fails for vagueness if persons of ordinary intelligence must speculate

as to the meaning of what the statute or regulation requires or prohibits or if it authorizes arbitrary and discriminatory enforcement. *Adams Outdoor Advert. Ltd. P'ship v. Pa. DOT*, 930 F.3d 199, 205 (3d Cir. 2019); s*ee also Gibson v. Mayor & Council of Wilmington,* 355 F.3d 215, 225 (3d Cir. 2004); *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 816 (E.D. Pa. 2007). A vague law fails to provide fair notice to those who must follow and enables enforcement officials to shape that law's contours as they see fit. *Rosedale & Rosehill Cemetary Ass'n v. Twp. of Reading*, 510 F. Supp. 3d 250, 263 (D.N.J. 2020) (quoting *Sessions v. Dimaya,* 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring).

Functionally, the policies' vagueness overlaps here with the analysis of whether they contain key terms that are incapable of reasoned application. For the same reason that those terms are not capable of such application, they are also vague. The terms previously identified in section C, *infra,* invite the school board and its agents to inject their subjective and self-serving understanding of those terms and enforcement them against regime critics.

*E.  Policies 903 and 922 are overbroad.*

The vagueness doctrine is similar, but not identical, to the overbreadth doctrine. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (explaining that "traditionally viewed vagueness and overbreadth as logically related and similar doctrines"). A speech regulation is overbroad and "can be struck down entirely if it proscribes a significant amount of constitutionally protected speech." *Sypniewski v. Warren Hills Reg'l Bd of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002). Because of the potential chilling effect, a regulation "can be found unconstitutionally overbroad if there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent." *Id* (internal quotations omitted). In evaluating overbreadth, this Court should consider reasonable limiting constructions. *Id.* at 259. But this

Court can also strike individual policy terms that create overbreadth problems. *Id.* at 265 (striking part of school policy directed at material that "creates ill will").

The previously identified provisions of Policies 903 and 922 create policies that are overbroad because they can be, and already have been, used to stifle speech that is critical of the school board and its policies or takes positions on contested issues that are at odds with Pennsbury's leadership. Such speech is obviously protected by the First Amendment. These policies are subject to complete facial invalidation, but this Court can avoid that step by stripping out the terms "personally directed," "abusive," "offensive," "otherwise inappropriate," and "personal attack" from Policy 903 and the terms "offensive," "inappropriate," and "verbally abusive" from Policy 902. In addition, this Court should impose a limiting construction on the terms "irrelevant" and "disruptive" to limit their application to speakers who are addressing matters wholly unrelated to school board business or whose manner of speech—not viewpoint—is likely to cause public disorder or interfere with others' rights to speak.

F.  *The address-disclosure provision of Policy 903 amounts to a compelled disclosure that is not reasonably related to the purposes of the forum.*

Policy 903 provides that speakers preface their remarks by announcing their address. Ex. A at 2. Historically, Defendants have usually been satisfied by the announcement of one's township of residence, but at the June 2021 meeting, Defendants began strictly enforcing the address disclosure requirement for speakers. Daly Decl. ¶ 13; Abrams Decl. ¶¶ 29-30. They have temporarily refrained from the practice, but the policy provision remains in place. Daly Decl. ¶ 14; Ex. A.

The right to free speech includes the right to refrain from speaking. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018). Here, compelling controversial speakers to disclose their addresses exposes the speakers, their homes, and families, to potential reprisals for unpopular speech, thereby inviting self-

censorship. Daly Decl. ¶ 13; Abrams Decl. ¶ 30. To be sure, a requirement that speakers confirm their in-district residence would be reasonable, but there is no need to require that this disclosure be publicly announced at the outset of controversial speech. *See Mansky,* 138 S.Ct. at 1888 (speech restriction in non-public forum must be reasonable and sensible). The address announcement requirement is needlessly and, perhaps intentionally, intimidating.

II. THE VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS INFLICTS IRREPARABLE HARM.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ctr. for Investigative Reporting,* 975 F.3d at 317; *AFDI,* 92 F. Supp. 3d at 331. Plaintiffs easily meet this requirement. Defendants are censoring written comments and recordings, and interrupting, speaking over, and cutting short oral comments, all under threat of permanent exclusion from school property. The ongoing risk of self-censorship and of future rights violations requires that this Court enjoin Plaintiffs from enforcing their policies and otherwise censoring protected speech.

III. ENFORCING THE FIRST AMENDMENT IS IN THE PUBLIC INTEREST.

"[T]he enforcement of an unconstitutional law vindicates no public interest." *K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) (citation omitted); *Am. Freedom Def. Initiative v. SEPTA,* 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015) (upholding the First Amendment is in the public interest).

IV. THE COURT SHOULD WAIVE RULE 65(C)'S BOND REQUIREMENT.

The Court should dispense with Fed. R. Civ. P. 65(c)'s security requirement, as "complying with the preliminary injunction raises no risk of monetary loss to the defendant," and "the balance of [the] equities weighs overwhelmingly in favor of the

party seeking the injunction." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (internal quotation marks omitted).

CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: October 8, 2021                    Respectfully submitted,

                              By:    */s/Michael Gottlieb*

Alan Gura*                           Michael Gottlieb
Endel Kolde*+                        PA Bar No. 36678
Martha Astor*+                       VANGROSSI & RECCHUITI
INSTITUTE FOR FREE SPEECH            319 Swede Street
1150 Connecticut Avenue, N.W.        Norristown, PA 19401
Suite 801                            610.279.4200
Washington, DC 20036                 mikem1a1@aol.com
202.301.3300
agura@ifs.org
dkolde@ifs.org
astorm@ifs.org

        *   Application pro hac vice pending
        +   Not yet admitted to D.C. Bar,
            Supervised practiced per D.C. Ct. Appeals R. 49(c)(8)