**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARSHALL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:21-cv-04336 |
| v. | ) | |
| | ) | |
| AMUSO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF OF AMICUS CURIAE FREE TO LEARN COALITION IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### STATEMENT OF INTEREST OF AMICUS CURIAE

Free to Learn Coalition ("FLC") is a nonpartisan organization established to support parents, caregivers, and community groups in advocating for a quality K-12 education.[1] FLC accomplishes this mission by partnering with parents and community groups to advocate for policies that will benefit their local schools. While partnering with local groups, FLC provides training on issues impacting their communities, including training on persuasive techniques to help parents communicate effectively at local school board meetings.

This case directly impacts FLC's mission of training parents to address school board hearings concerning the salient issues of the day.

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus curiae or their counsel contributed money intended to fund preparation or submission of this brief. Plaintiffs have consented to the filing of this brief. Defendants have objected to the filing of this brief. Amicus curiae has simultaneously filed a Motion for Leave to File this amicus brief.

## INTRODUCTION

One of the most celebrated works of American art is Norman Rockwell's "Freedom of Speech." Painted in 1943 as part of an effort to encourage Americans to purchase war bonds, the painting depicts a man at a New England town meeting. The man wears working clothes, a blue-checked flannel shirt with a brown jacket. He rises to speak, with the town's annual report stuffed into his left jacket pocket. The man appears at the beginning of his speech. Seated to the speaker's right and his left are men wearing suits and ties. Both other men, in their black ties and white shirts, look up at the speaker, listening respectfully.

We do not know what the speaker is saying, but the content of the speaker's speech doesn't matter to Rockwell. What does matter is that all in attendance—the men in suits and ties, the woman in the hat, the man behind the speaker—all focus on the speaker, listening. The painting invokes solemnity to our Nation's commitment to free and robust debate on issues of public importance. The man's ability to rise and address his town government on equal footing with his suited peers is sacred in our constitutional republic, yet fragile, and as Rockwell evoked, something worth defending.[2]

But had Rockwell attended a school board hearing in Pennsbury, Pennsylvania, the painting would have appeared quite different. Rather than listening to the opinions of the man speaking, there would have been a Presiding Officer drowning the man's speech with accusations of hostility and derisively labeling his speech irrelevant or inaccurate. And when the humble speaker tried to assert his constitutional free-speech rights, a board member contemptuously shouts that, at Pennsbury school board meetings, that the First Amendment doesn't apply.

---

[2] *See generally* Freedom of Speech, The Saturday Evening Post, 1943 *available at* https://picturingamerica.neh.gov/downloads/pdfs/Resource_Guide_Chapters/PictAmer_Resource_Book_Chapter_19A.pdf (last visited Nov. 7, 2021).

Yes, Rockwell's painting of Pennsbury's school board meetings would have been far less solemn, far less dignified, and far less respectful.

**ARGUMENT**

"Premised on a mistrust governmental power" the First Amendment declares, in no uncertain terms, that Congress shall make no law . . . abridging the freedom of speech." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); U.S. CONST. amend. I.[3] The Free Speech Clause is therefore committed "to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964). Indeed, it protects debate on *all* public issues, including speech that some might view as "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id*. at 270-71; *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Accordingly, the "fixed star" of the Free Speech Clause's guarantee is "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It is therefore especially egregious when a government discriminates against a speaker based on the speaker's viewpoint. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

And although FLC finds the following activities reprehensible and unconscionable, it is no surprise then that the U.S. Supreme Court has found that the Free Speech Clause protects Nazis

[3] The First Amendment's free speech guarantee applies to the states through the Fourteenth Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

parades and flag burning, *see McCutcheon v. FEC*, 572, U.S. 185, 191 (2014), the despicable public jeering of a fallen soldier at his private funeral, *see Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011), lying that does not rise to defamation or perjury, *see United States v. Alvarez*, 567 U.S. 709, 723-724 (2012), offensive words that disparage or bring into contempt or disrepute any person, and words that are deemed immoral or scandalous, *see Matal v. Tam*, 137 S. Ct. 1744 (2017), *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), including standing in the corridor of a courthouse while wearing a jacket bearing the phrase "F**k the draft," *see Cohen v. California*, 403 U.S. 15, 18 (1971).

Although the First Amendment applies as a restraint to the federal, state, and local government officials alike, the officials and members of the Pennsbury School Board, as well as the employees of the Pennsbury School District, evidently believe the First Amendment does not apply to them. Defendant Michael Clarke, Pennsbury's solicitor, interrupted Plaintiff Robert Abrams, "spoke over him, and declared 'you don't' have First Amendment rights in here . . . ." Compl. ¶ 31.

This Court should grant Plaintiffs' requested injunction and remind local governments that the First Amendment applies to restrain their conduct and to permit the robust free exchange of ideas, even ideas the School Board may not like.

## I. THE PENNSBURY SCHOOL DISTRICT AND PENNSBURY SCHOOL BOARD'S SPEECH CODE CONSTITUTE VIEWPOINT DISCRIMINATION.

### A. Censors Violate The Viewpoint Discrimination Prohibition Even When Censors Apply A Speech Code Evenhandedly.

School board meetings are considered limited public forums. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983). This designation means that the forum "is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). Although governments may impose

content-based restrictions on speech in limited public forums, *see Rosenberger*, 515 U.S. at 829, they may do so only if the content-based speech limits are "reasonable in light of the purposed served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Notwithstanding this leeway, the First Amendment prohibits the government from engaging in invidious viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829.

In constitutional jurisprudence, the term "viewpoint discrimination" captures a broad swath of government regulation of speech. *Matal*, 137 S. Ct. at 1763. Indeed, viewpoint discrimination occurs even when a statute regulating speech treats all sides of a debate equally. *See id.* Thus, the Lanham Act's disparagement clause, which forbade criticism of "Democrats and Republicans, capitalists, and socialists, and those arrayed on both sides of every possible issue," nonetheless constituted viewpoint discrimination because "[g]iving offense is a viewpoint." *Id*. In other words, a law that "reflects the Government's disapproval of a subset of messages it finds offensive[]" is the essence of viewpoint discrimination *Id*. at 1766. Thus, the government cannot discriminate against ideas that offend. *Id*. at 1751 ("It offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend."); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299-2300 (2019) (holding that the Lanham Act's prohibition of registering marks that are immoral or scandalous constitutes facial viewpoint discrimination because it permits registration for marks that are in accord with conventional mores and prohibits marks that are opposed to conventional mores). At bottom, viewpoint discrimination occurs when the government permits speech that "induc[es] societal nods of approval" and prohibits speech that "provoke[es] offense and condemnation." *Id*. at 2300.

Unfortunately, Pennsbury's speech codes are not the only school-board speech codes that are used to stifle robust debate. *See infra* at 12-14. Indeed, right leaning school boards use speech codes to stifle debate just as much as Pennsbury's left leaning school board has done so to silence dissent. Earlier this year, the Sixth Circuit ruled that several provisions in Ohio's school-board meeting codes were facially unconstitutional and constituted viewpoint discrimination. *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887 (6th Cir. 2021). In *Ison*, the town of Madison, Ohio authorized the Board's presiding officer to:

1. Prohibit public comments that are frivolous, repetitive, and/or harassing;

2. Interrupt, warn, or terminate a participant's statement if the statement is too lengthy, personally directed, abusive, off-topic, antagonistic, obscene, or irrelevant;

3. Request any individual to leave the meeting when that person does not observe reasonable decorum; and

4. Request the assistance of law enforcement officers in the removal of a disorderly person if that person's conduct interferes with the orderly progress of the meeting.

*Ison*, 3 F.4th at 891.

In response to a shooting at a Madison County public school that left four students injured, the school board "enacted a resolution allowing staff to carry concealed weapons." *Id*. at 891. Parents of students opposed to this resolution attended a school board meeting. *Id*. There, one of the parents read from prepared remarks "accusing the Board of threatening the school to punish the student protestors" who had staged a walkout to protest the resolution. *Id*. The parent then called the Board's justification for the punishment "a smokescreen intended to conceal their true motivation . . . to suppress all opposition to pro-gun views and push its pro-gun agenda." *Id*. at 892.

During these remarks, the Board interrupted the parent twice. *Id*. The Board President asked the parent to refrain using the word "threatening" while another Board member accused the

parent of "putting words in the Board's mouth and saying things that are not fact." *Id*. at 892. Finally, the Board President asked the parent to stop talking and threatened the parent that if he continued with his speech, security would escort the parent out of the room. *Id*. at 892. The parent continued, finished his speech, and was then escorted out of the room. *Id*. The Board President later recalled that the parent was "unruly," "not following the rules, [and] being hostile in his demeanor," and he admitted that he tried to stop the parent from speaking when the Board President saw other people becoming offended. *Id*. The parents sued, claiming that the Board's speech code facially violated the First Amendment.

Relying on the Supreme Court's opinions in *Matal* and *Iancu*, the Sixth Circuit held that the Board's "abusive" provision, the "antagonistic" provision, and "personally directed" provision all constituted unconstitutional viewpoint discrimination and therefore failed as a facial matter. *Id*. at 894. The antagonistic restriction constituted viewpoint discrimination because it prohibited "speech opposing the Board." *Id*. at 894. So too did the abusive provision and personally directed provision. According to the Sixth Circuit, "th[o]se terms plainly fit in the broad scope of impermissible viewpoint discrimination because . . . they prohibit speech purely because it disparages or offends," *id*., and stopping speech solely because it offends violates the First Amendment. *Id*.

The Sixth Circuit also granted the as-applied challenge. The Board President stated that he stopped the parent because "he found [the parent's] speech hostile, personally directed, and abusive." *Id*. But—very similar to the situation before this Court—the video of the parent's speech contradicted the Board President's testimony. The video evidence demonstrated that the parent "spoke calmly, used measured tones, and refrained from personal attacks or vitriol, focusing instead on his stringent opposition to the Board's policy and his belief that the Board was not being

honest about its motives." *Id*. at 895. For that reason, the Sixth Circuit found that the Board's policies violated the First Amendment as-applied to the parent. *Id*.

**B. Pennsbury's Speech Code Constitutes Viewpoint Discrimination.**

Here, the Pennsbury's school-board meeting speech code empowers the presiding officer to:

1. Interrupt or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant. *Compare with Ison*, 3 F.4th at 891.

2. Request any individual to leave the meeting when that person does not observe reasonable decorum. *Compare with id*.

3. Request the assistance of law enforcement officers to remove a disorderly person when that person's conduct interferes with the orderly progress of the meeting. *Compare with id.*

4. Call a recess or adjourn to another time when the lack of public decorum interferes with the orderly conduct of the meeting.

5. Waive these rules with the approval of the Board.

Compl. ¶ 28 (citing Policy 903 Guidelines). The school board is also empowered to "excise such speech from the official recordings of Pennsbury School Board meetings." Compl. ¶ 29. Then, in May of 2021, Pennsbury enhanced their speech codes enacting a "civility policy" which prohibits "offensive, inappropriate, intolerant, and/or threatening speech or behavior," as well as abusive speech. Compl. ¶¶ 35-36.

For the following reasons, Pennsbury's policies constitute impermissible viewpoint discrimination.

*First*, the term "abusive" constitutes facial viewpoint discrimination. The term "abusive" is not defined in the Pennsbury School Board's policies, (Ex. 2A) (ECF 44-5 at 1, 5-6), but it is commonly understood to mean "harsh and insulting," *Ison*, 3 F.4th at 893 (quoting Merriam-Webster's dictionary). And Pennsbury may not prohibit speech simply because it is harsh or

insulting. *See id*. at 894 (citing *Matal*, 137 S. Ct. at 1763); *see New York Times*, 376 U.S. at 270-71 (stating that the First Amendment protects speech that is "vehement, caustic, and [includes] sometimes unpleasantly sharp attacks on government and public officials.").

*Second*, the term "irrelevant" similarly constitutes facial viewpoint discrimination. The term "irrelevant" is also undefined in the Pennsbury School Board's policies, (Ex. 2A) (ECF 44-5 at 1, 5-6), but dictionary definitions define the term as "not important" or "not relating to what is being discussed right now.[4]" By this definition, the school board is empowered to determine what speech is important and what is not. But the First Amendment does not allow the government to claim prerogative to decide what is and what is not important, and what is and what is not the public interest. *See Gertz v. Robert Welch*, 418 U.S. 323, 346 (1974); *see also N.Y. Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 489 (2d Cir. 2013).

Although limited public forums may employ content-based speech limitations, *Cornelius*, 473 U.S. at 806, those content-based speech limits must be viewpoint neutral. *Id*. Here, the Board used the "irrelevant" provision as a cudgel to cleave out speech it opposes, rather than a scalpel to preserve as much free speech as possible. It prohibited speakers from referring to its equity policy as "critical race theory," even though the speaker insisted that he thought the policy constituted critical race theory and wanted present his argument as such. Compl. ¶ 90. This constitutes viewpoint discrimination because it permits only those speakers who agree with the Board's terminology to speak and not use their own terminology. Further, the First Amendment empowers the speaker "to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

---

[4] *See* Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/irrelevant (last visited Nov. 8, 2021).

*Third*, the term "personally directed" also limits a speaker's viewpoint, those of the view that directly addressing a board member is the most persuasive form of speaking. *Meyer*, 486 U.S. at 424. The Court should therefore grant Plaintiffs' requested injunction.

## II. THE FREE SPEECH CLAUSE'S GUARANTEE IS NOT DEPENDENT ON A DOCTOR'S INTERPRETATION OF WHETHER THE SPEECH IS OFFENSIVE OR NOT.

Pennsbury defends its policies not by limiting its policy's reach, but by doubling down. Relying on an expert witness, Pennsbury asserts that the Plaintiff spoke "in coded, racist terms, also known as 'dog whistles.'" ECF 44-2 ¶ 22. Specifically, Pennsbury's expert examined the following speech offered by Plaintiff:

> Historically, quite frankly, it's the Left that's always been problematic regarding race. Only the Left owned slaves. Then we had the Emancipation Proclamation, to which the Left responded with a terrorist group known as the Klu Klux Klan. And legislatively the Jim Crow Laws, which disenfranchised Black people. We had Margaret Sanger who created the American Eugenics Society, which eventually became Planned Parenthood, for obvious reasons. . . . LBJ created the Great Society, which incentivized the destruction of many Black families. The Clinton Crime Bill, which created much larger penalties for cocaine for young black men.
>
> . . . .
>
> In 2019, FBI statistics show that only 9 unarmed Black men were killed by police, and 19 unarmed White men.
>
> . . . .
>
> You have thousands of young Black men who are being shot and killed in inner cities, but the media doesn't focus on that.

*Id.* ¶¶ 24-26. In the expert's view, Plaintiff's "comments are filled with microaggressions, . . . explicitly racist ideas"; are "harmful" and "abusive"; and "none . . . are relevant to the work taking place in the Pennsbury School District." *Id.* ¶¶ 27-29.

By reaching this conclusion, Pennsbury's expert cleanly underscores why the Supreme Court has, at least since it decided *Buckley v. Valeo*, in 1976, *see* 424 U.S. 1 (1976), eschewed any

test for First Amendment protection that turns either on the subjective intent of the speaker or the effect of the communication on the listener. "[A]n intent-based test would chill core political speech by opening the door to a trial on every" otherwise protected communication and "could lead to the bizarre result that identical" expression that occurs "at the same time could be protected speech for one speaker" but not for another. *See FEC v. Wis. Right to Life*, Inc., 551 U.S. 449, 468 (2007). "First Amendment freedoms need breathing space to survive," *see NAACP v. Button*, 371 U.S. 415, 433 (1963), but "[a]n intent test provides none," *Wis. Right to Life, Inc.*, 551 U.S. at 468-69 (2007).

"[A] test based on the actual effect speech" has on a listener is even more "flaw[ed]."*Id.* at 469. Most problematically, "Such a test 'puts the speaker . . . wholly at the mercy of the varied understanding of his hearers.'" *Id.* (quoting *Buckley*, 424 U.S. at 43). It also creates tremendous practical issues. "It would," as is the case here, "lead to a burdensome, expert-driven inquiry, with an indeterminate result" that will unquestionably chill a substantial amount of political speech." *Id.*

In this case, Plaintiff offered his opinions on unquestionably public issues, and the First Amendment inquiry must "reflec[t] our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id*. at 467 (quoting *Buckley*, 424 U.S. at 14). And although the Defendants' expert is entitled to her opinion that the Plaintiff's speech "contained microaggressions, . . . explicitly racist ideas"; are "harmful" and "abusive"; and "none . . . are relevant to the work taking place in the Pennsbury School District," ECF 44-2 ¶¶ 27-29, the First Amendment does not allow her "expert" opinion (which Plaintiff certainly disputes) to excuse a rank heckler's veto.

## III. DENYING PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION COULD HAVE A RIPPLE EFFECT, LIMITING DEBATE AT SCHOOL BOARDS HEARINGS ELSEWHERE.

As this case progresses, the importance of this moment cannot be overstated, and the Court's role as a rampart against further intrusions into the rights enshrined in our First Amendment has rarely been more vital. The government, of course, "is not free to disregard the First Amendment in times of crisis," *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring), nor may it do so for reasons of convenience or comfort. Although this Court's jurisdiction in this case is limited to Pennsbury's School Board, granting Plaintiffs the injunctive relief they request would send a signal that the Article III branch remains committed to protecting the expressive and petitionary rights of *all* individuals, and not only those with whom the Government approves. Declining to do so, in turn, will embolden the Government officials who are mirroring Pennsbury's censorship.

This risk is neither hypothetical nor conjectural; school boards throughout the Nation are starting to impose draconian, arbitrary, viewpoint-based restrictions on speakers who wish to have their voices heard by the persons responsible for public education. Virginia's Prince William County School Board, for instance, recently altered its public-speaker policy in ways that raise similar concerns of viewpoint discrimination as those raised by Pennsbury's constitutionally flawed policy:

> Citizen comment time, public hearings, and town halls are intended to allow the Prince William County school community to address the School Board regarding topics or subjects which relate directly to the overall operations and policies of the School Division and are of public concern to the school community.
>
> Speakers shall respect the privilege extended by the School Board by using commonly accepted rules of courtesy, respect, civility, and decorum. The use of obscenity or defamation is strictly prohibited and shall be ruled out of order.
>
> Groups or individuals creating a disturbance which interferes with the orderly conduct of the meeting will be asked to leave by the Chairman At-Large or by the

> PWCS Department of Risk Management and Security, as will groups or individuals whose conduct or statements threaten the safety of anyone in attendance at the meeting.
>
> The Chairman At-Large may call a recess at any time during the meeting when individuals or groups fail to comply with these rules, and the School Board may agree, by majority vote, to suspend this policy and any citizen comment period, public hearing or town hall for the same reasons.[5]

Minnesota's Mankato School Board is also following suit, promulgating rules that make things like applause, shouts, or any similar "outbursts" grounds for terminating open-forum sessions.[6] Several Florida School Boards are also in lockstep; the Indian River School Board has proposed rule changes designed "to focus on the meeting's agenda and steer conversation clear from political agendas and platforms," despite arguments that it will "strip . . . First Amendment rights,"[7] while the Sarasota County School Board has forbidden "actions such as cheering, jeering, discriminatory, unreasonably loud, abusive or profane language or gestures."[8] The same is true of at least one

[5] *Available at* https://go.boarddocs.com/vsba/pwcs/Board.nsf/goto?open&id=BYXSDP7235FB.

[6] *See* Kristine Goodrich, "School Board tightens public comment rules," The Free Press (Oct. 31, 2021), *available at* https://www.mankatofreepress.com/news/local_news/school-board-tightens-public-comment-rules/article_ca4ce0d6-3900-11ec-b5da-979a7ff0c252.html.

[7] Sommer Brugal, "So you want to address the Indian River School County Board? New rules may be coming," Treasure Coast Newspapers (Oct. 10, 2021), *available at* https://www.tcpalm.com/story/news/education/2021/10/10/indian-river-may-change-how-parents-address-school-board/6008954001/

[8] Ryan McKinnon, "Sarasota School Board votes to tighten rules on public comment at meetings," Sarasota Herald-Tribune (Oct. 20, 2021), *available at* https://www.heraldtribune.com/story/news/2021/10/20/sarasota-school-board-advances-new-public-comment-rule-meetings/8505716002/

school board in Kentucky,[9] and, of course, Loudoun County, Virginia, which has sharply curtailed which members of the public are eligible to speak during school-board meetings.[10]

The dominos are beginning to fall, but there is still time to stop them from cascading into additional school boards. This Court has the opportunity to resuscitate, in Pennsbury at least, "our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Wis. Right to Life, Inc.*, 551 U.S. at 467 (quoting *Buckley*, 424 U.S. at 14). In doing so, it may just function as a constitutional bulwark, preventing this First Amendment erosion from further metastasizing throughout the Nation.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' requested injunction.

Dated: November 15, 2021

Respectfully submitted,

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher
PA I.D. No. 37950
kag@glawfirm.com
Russell D. Giancola
PA I.D. No. 200058
rdg@glawfirm.com
**GALLAGHER GIANCOLA LLC**
436 Seventh Avenue, 31st Floor
Pittsburgh, PA 15219
412.717.1900 (Phone)
412.717.1901 (Fax)

[9] Andrew Atterbury & Juan Perez Jr., "'Threats of violence': School boards curb public comments to calm raucous meetings," Politico (Oct. 27, 2021), *available at* https://www.politico.com/news/2021/10/27/school-boards-covid-restrictions-violence-517326.

[10] *See* School Board FY2023-FY2028 CIP & CAPP Public Hearing/Work Session—Nov. 15, 2021, Loudoun County Public Schools, *available at* https://www.lcps.org/citizenparticipation.

Shawn Toomey Sheehy*
ssheehy@holtzmanvogel.com
Edward Wenger*
ewenger@holtzmanvogel.com
**HOLTZMAN VOGEL BARAN TORCHINSKY JOSEFIAK PLLC**
15405 John Marshall Highway
Haymarket, VA 20169
540.341.8808 (Phone)
540.341.8809 (Fax)

* *Pro Hac Vice Motion Forthcoming*

*Counsel for Amicus Curiae,*
*Free to Learn Coalition*