## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS MARSHALL, et al., | : | |
| *Plaintiffs* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PETER C. AMUSO, et al., | : | No. 21-4336 |
| *Defendants* | : | |

### MEMORANDUM

PRATTER, J.                                                    NOVEMBER /7, 2021

"You don't suppose this kind of thing is ever finished, do you? Tomorrow it'll be something else . . . ." *Inherit the Wind* (1955).

The plaintiffs in this case seek a preliminary injunction to prevent application of certain provisions in Pennsbury School Board policies that restrict speech at public meetings. Because the plaintiffs are likely to demonstrate that the challenged policy provisions violate the First Amendment's prohibition on viewpoint discrimination and because protecting free speech serves the public interest, the Court will grant a preliminary injunction as further discussed below and specified in the accompanying Order.

### BACKGROUND

### I.      School Board Policies

The Pennsbury School Board invites public comment at its meetings. Doc. No. 4-7, at 1. The Board's Policy 903 governs public participation in school board meetings and Policy 922 (designated by the Board as the "Civility Policy") applies to all school activities. *Id.*; Doc. No. 4-9, at 1.[1] Any taxpayer, school employee, or student is allowed five minutes to make a comment,

---

[1] The District argues that Policy 922 was designed for other meetings rather than School Board meetings and operates more as precatory language for School Board meetings. Nov. 8, 2021 Tr. at 166:16–18. However, nothing in Policy 922 makes this distinction for School Board meetings. The plain language of

subject to certain requirements and restrictions.  Doc. No. 4-7, at 3.  Speakers "must preface their comments by an announcement of their name, address, and group affiliation if applicable." *Id.* The Board's presiding officer may interrupt or terminate public comments deemed "too lengthy, personally directed, abusive, obscene, or irrelevant." *Id.*  The presiding officer may also "[r]equest any individual to leave the meeting when that person does not observe reasonable decorum" and can "[r]equest the assistance of law enforcement officers to remove a disorderly person when that person's conduct interferes with the orderly progress of the meeting." *Id.*  Similarly, "offensive, obscene or otherwise inappropriate banners or placards, or those that contain personal attacks" are prohibited. *Id.* at 4.

In 2020, the COVID-19 pandemic temporarily shifted Pennsbury School Board meetings to a virtual setting.  The Board received written submissions from "speakers" in advance of each virtual meeting.  Doc. No. 44-4 ¶¶ 8–13.  By the January 2021 meeting, the School Board began screening comment submissions for violations of Policy 903 and then informing commenters via email if their comments were rejected for such a violation.  Nov. 12, 2021 H'rng Tr. at 8:5–13; Doc. Nos. 4-13, 4-14, 4-15.  Acceptable written comments were posted on the Board's website. Nov. 8, 2021 H'rng Tr. at 132:16–20.  This practice continued until the School Board returned to in-person meetings in March 2021.  Doc. No. 44-4 ¶ 39.  The School Board posts videos of each public Board meeting on its website.  Doc. No. 44-4 ¶ 43.

---

Policy 922 includes "any type of district meeting" and the prohibitions in it largely overlap the prohibitions in Policy 903.  Doc. No. 4-9, at 2.

## II.    Application of School Board Policies

Plaintiffs are four Pennsbury School Board meeting attendees whose public comments have been interrupted or terminated by Board members or designees based on Policy 903.[2] The parties have submitted videos of each meeting for the Court's review as part of this litigation.

In March 2021, Mr. Marshall gave a public comment without interruption. However, after the meeting video from that session was posted on the District's website, the Board decided to take the video off the website to revise certain of Mr. Marshall's comments to remove his comments the Board deemed after-the-fact to be in violation of Policy 903. Doc. No. 44-4 ¶¶ 41–42. School Board President Christine Toy-Dragoni then issued a public statement explaining that the comments were removed because they "were abusive and irrelevant to the work taking place in the Pennsbury School District." Doc. No. 4-17, at 2. Ms. Toy-Dragoni stated that "[t]he comments escalated from expressing a viewpoint to expressing beliefs and ideas that were abusive and coded in racist terms, also known as 'dog whistles.'" *Id.* She also apologized to the community for not interrupting Mr. Marshall as he was making his comments. *Id.* The Board's post-meeting actions (including the Board President's public apology) were prompted by Dr. Cherrissa Gibson, the District's Director of Equity, Diversity & Education, who, after the meeting where Mr. Marshall spoke, conferred with the Board about her views of Mr. Marshall's comments. Nov. 8, 2021 H'rng Tr. at 109:21–110:6. Two weeks after the Board-edited video was posted, it was replaced with the full, unedited version. Doc. No. 44-4 ¶ 45.

---

[2] Two of the plaintiffs also submitted written comments for virtual meetings that the Board rejected for violating Policy 903. Doc. No. 44-4 ¶¶ 27, 31. The temporary procedure of receipt and review of written comments in lieu of in-person public comments has been discontinued with the return to in-person School Board meetings. Nov. 8, 2021 H'rng Tr. at 106:14–107:2. The Court makes no comment about any future resumption of efforts to review and publish written comments, other than to observe that this ruling would have implications for such a practice.

3

Then, at the May 2021 Board meeting, three of the plaintiffs claimed five minutes each in order to speak: Mr. Daly, Mr. Marshall, and Mr. Abrams. *Id.* ¶ 49. The meeting agenda included a presentation on the Pennsbury School District's equity program. *Id.* ¶ 46. Mr. Amuso, the School Board's Assistant Solicitor, interrupted each of Mr. Daly's, Mr. Marshall's, and Mr. Abrams's comments at the May 2021 meeting for alleged violations of Policy 903. First, Mr. Daly began by defending what the Board's representative deemed to be Mr. Marshall's "abusive" March 2021 comments. *Id.* ¶ 49(a). Mr. Amuso demanded that Mr. Daly terminate his comments because he (Mr. Amuso) considered them to also be abusive and irrelevant and thus in violation of Policy 903. *Id.* ¶ 50. He also interrupted Mr. Marshall's comments because Mr. Marshall referred to the equity policy using a different programmatic title rather than the Board's formal chosen title for that program/policy, and then Mr. Amuso terminated Mr. Marshall's comments as abusive and irrelevant. *Id.* ¶ 52; May 20, 2021 Meeting Video at 1:47:15.[3] Mr. Abrams endeavored to discuss survey results for the equity policy and voiced his opposition to funding a program for the portion of respondents that reported they were unhappy, and Mr. Amuso terminated Mr. Abrams's comments as "irrelevant to diversity in education." Doc. No. 44-4 ¶¶ 49(c), 53. In each instance, Mr. Amuso shouted over the speakers during their allotted time segments, yelling "you're done!" repeatedly until the speaker left the microphone. Doc. No. 4-3 ¶ 18; Doc. No. 4-4 ¶ 27; Doc. No. 4-5 ¶ 11.[4]

---

[3] The May 20, 2021 meeting video is available at http://video.pennsburysd.org/video/553350697.

[4] But for the implication of, and intrusion upon, the First Amendment, perhaps the shouting match between Mr. Amuso and Mr. Marshall about the name of the "equity policy" could have been best characterized as a childish willful contest of semantics or an embarrassing version of "My dog's bigger than your dog! Is not! Is so!" But it cannot be dismissed as such. Rather, it is indicative of representatives of a public entity taking the opportunity to squelch plaintiffs' views as apostasy. That behavior by members and representatives of the School Board underscores the problems inherent with a subjective interpretation of terms like "irrelevant," most especially where the School Board member or representative seems to have a personal interest in the topic at issue.

At the June 2021 meeting, the School Board enforced the address announcement requirement by reminding speakers to state aloud their home addresses at the beginning of their remarks. Doc. No. 4-4 ¶ 29. At this meeting, Mr. Campbell criticized Policy 903 and the School Board's implementation of it. Doc. No. 4-6 ¶ 7(a). He was able to finish his remarks, but Solicitor Michael Clarke interrupted a portion of Mr. Campbell's allotted speaking time to lecture him that personal insults or personally directed comments would lead to his comments being terminated. *Id.* ¶ 7(b). Mr. Abrams, Mr. Marshall, and Mr. Daly also spoke for their full five minutes. *See* Doc. No. 44-8.

The parties agree that the address announcement requirement has not been enforced since the June 2021 meeting. Doc. No. 44-4 ¶ 59. However, the parties also agree that it has not been rescinded and remains part of Policy 903 as written. Nov. 8, 2021 H'rng Tr. at 127:22–128:9.

Mr. Daly, Mr. Abrams, and Mr. Campbell each spoke at the August 2021 meeting. *See* Doc. No. 44-9. Despite each of the three speakers making apparently personally-directed comments, none were then interrupted for violations of Policy 903. *Id.* Mr. Campbell testified in court that he observed an armed police presence at the August 2021 meeting. Nov. 8, 2021 H'rng Tr. at 15:24–16:1. At the court hearing, witnesses for the Pennsbury School District did not dispute the police presence at this meeting or the fact that Policy 922 provides for removal of speakers by law enforcement personnel. Nov. 8, 2021 H'rng Tr. at 162:22–163:5; Doc. No. 4-7, at 2.

Several of the plaintiffs have expressed under oath their concerns about being thrown out of public Board meetings as warned in the Policy or as a result of comments to that effect made by or on behalf of the Board at meetings. They testified that this has either caused them to refrain from speaking at subsequent meetings or to cabin their comments. Doc. No. 4-3 ¶ 21; Doc. No. 4-6 ¶ 10; Nov. 8, 2021 H'rng Tr. at 9:17–10:6, 26:7–16, 75:24–76:7.

The plaintiffs seek to enjoin the defendants (collectively, the "District") from enforcing (1) Policy 903's prohibitions of speech deemed "personally directed," "abusive," "irrelevant," "offensive," "otherwise inappropriate," or "personal attacks;"; (2) Policy 922's similar prohibitions of speech deemed "offensive," "inappropriate," "intolerant," "disruptive," and "verbally abusive" (collectively, the "Challenged Policy Terms"); and (3) Policy 903's address announcement requirement. Doc. No. 4-1, at 1.

A hearing on the preliminary injunction was held on November 8, 2021, with closing arguments presented on November 12, 2021. The next public Board meeting is scheduled for November 18, 2021.

## LEGAL STANDARD

The purpose of issuing a preliminary injunction is to maintain "the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

The Court may grant a preliminary injunction only if "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendants; and (4) granting the injunction is in the public interest." *P.C. Yonkers, Inc. v. Celebrations the Party Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (internal quotation marks omitted). If the first two "gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four

factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

DISCUSSION

The Court will examine each of the four preliminary injunction factors in turn.

## I.    Likelihood of Success on the Merits

While the moving party typically faces the burden to establish the likelihood of success on the merits, "[i]n First Amendment cases the initial burden is flipped." *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020). "The government bears the burden of proving that the law is constitutional" and, as a result, "the plaintiff 'must be deemed likely to prevail' if the government fails to show the constitutionality of the law." *Id.* (quoting *Reilly*, 858 F.3d at 180).

The First Amendment protections for free speech apply to speaking at public school board meetings. *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174–75 (1976).[5] The parties agree that a school board meeting is a limited public forum. *See* Doc. No. 4-2, at 10; Doc. No. 43-1, at 6. In a limited public forum, "[c]ontent-based restrictions are valid as long as they are reasonable and viewpoint neutral." *NAACP v. City of Phila.*, 834 F.3d 435, 441 (3d Cir. 2016). However, "viewpoint discrimination is impermissible in any forum." *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 313 (3d Cir. 2020), *cert. denied sub nom. SEPTA v. Ctr. for Investigative*, No. 20-1379, 2021 WL 4507651 (Oct. 4, 2021).

"[I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, [the Supreme Court has] observed

---

[5]    Where speech also implicates the right to petition, "courts have generally applied Speech Clause precedent, rather than any freestanding Petition Clause doctrine." *Mirabella v. Villard*, 853 F.3d 641, 654 (3d Cir. 2017).

a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is . . . blatant." *Id.* at 829. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Apropos of the case at hand, "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Id.* at 831.

"Giving offense is a viewpoint." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). "[D]isfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (internal quotation marks omitted). A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint. *Matal*, 137 S. Ct. 1744 at 1766 (Kennedy, J., concurring in part) ("The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses.").

The District here argues that Policies 903 and 922 are facially valid because "there is no language in either [policy] that identifies any particular viewpoint, political affiliation, etc. that is not permitted." Doc. No. 44-1, at 6. However, the plaintiffs argue that the application of the Challenged Policy Terms to interrupt or terminate their five minutes' worth of public comments

violated their free speech rights and they argue that the terms at issue are facially invalid because they are overbroad and vague.

## A. As-Applied Challenge

The District argues that the School Board did not technically engage in viewpoint discrimination in interrupting or terminating each plaintiff's comments because each plaintiff was able to provide opinions in opposition to the same agenda items at least on a variety of occasions. The District also avers that "even assuming, *arguendo*, that [Mr.] Marshall had some protected speech in the video, which is expressly denied, there was no viewpoint discrimination when his comments were edited from the video." Doc. No. 44-1, at 5.[6] The plaintiffs argue that the Challenged Policy Terms are unconstitutional as applied to their exercise of their rights of free speech. Doc. No. 4-2, at 14.

Public speech at school board meetings is in fact protected by the First Amendment. *City of Madison, Joint Sch. Dist. No. 8*, 429 U.S. at 174. And allowing a viewpoint to be offered on some occasions without interruption does not prove the policy viewpoint neutral. Indeed, selective enforcement of a policy only when a presiding officer is feeling provoked does not help to support the policy's constitutionality. *See infra* Section I.B.1. The School Board personnel interrupted and terminated comments deemed "personally directed" as violations of Policy 903. As Policy 903 is applied (and as confirmed by the Board's witnesses and counsel at the preliminary injunction hearing), positive and complimentary personally-directed comments supportive of Board and school employees are permitted to be expressed, but negative, challenging, or critical personally-directed comments are prohibited. Nov. 8, 2021 H'rng Tr. at 104:7–14, 105:1–4; Nov. 12, 2021 H'rng Tr. at 39:2–15. Likewise, those who express support for a decision by singling out

---

[6] Under its shifted burden, the District provides no basis on which this Court could find that any of the plaintiffs' speech is not protected speech.

a School Board member are welcome, but those who criticize a decision are cut off.  This is viewpoint discrimination regardless of whether speakers are at other times allowed to make a verbal personal attack.

The School Board has also censored and terminated comments deemed "abusive" because they include comments deemed offensive racial stereotypes.  While this Court does not address the School Board's or its employees' assessment of whether the speech was offensive or to whom, suffice it to say that the First Amendment protects offensive speakers.  The Policy terms invoked to terminate the offensive comments ("abusive" and "personally directed") "prohibit speech purely because it disparages or offends." *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). This, too, is impermissible viewpoint discrimination.  The District has not carried its burden to demonstrate otherwise.

Additionally, the plaintiffs argue that, while the policy terms "irrelevant" and "disruptive" may survive a facial challenge, the District engaged in viewpoint discrimination in applying these terms to the plaintiffs' speech. Doc. No. 4-2, at 14.  Mr. Amuso terminated several comments as "irrelevant," including terminating Mr. Abrams's comments solely on the basis that they were deemed by Mr. Amuso to be irrelevant. Doc. No. 44-4 ¶ 53.  However, it is unclear how Mr. Abrams's comments about the District's equity survey could be considered "irrelevant" to the meeting agenda item of the District's equity policy.  Mr. Amuso also interrupted Mr. Marshall's comments, stating that his comments were "irrelevant" if he (Mr. Marshall) referred to the equity policy by a different name. *Id.* ¶ 52; May 20, 2021 Meeting Video at 1:47:15.  Mr. Amuso applied

his own (or perhaps the Board's) subjective interpretation of relevance, deeming Mr. Abrams's and Mr. Marshall's comments "irrelevant to diversity in education." *Id.* ¶¶ 52–53. Yet, it is clear that both Mr. Abrams and Mr. Marshall spoke about the equity policy, a topic plainly on the agenda. Further, the Board opened this comment period "for public comment on agenda and non-agenda items." May 20, 2021 Meeting Video at 1:37:23. The Court questions how a comment about a District policy during a period open to "non-agenda items" could be considered "irrelevant" except under a subjective interpretation of what arguments are acceptable to the Board and its representatives. The District fails to establish that its application of the term "irrelevant" does not constitute viewpoint discrimination as would be necessary to carry its shifted burden.

The plaintiffs also challenge the application of the term "disruptive." When Mr. Amuso terminated Mr. Marshall's comments at the May 2021 meeting, he informed Mr. Marshall that his comments were terminated under Policy 903 because Mr. Marshall was "being disruptive and disorderly." May 20, 2021 Meeting Video at 1:51:25. However, the District has offered no basis on which this Court could find that Mr. Marshall was being disruptive. During his May 2021 comments, as seen and heard on the video recording, Mr. Marshall did not raise his voice or speak out of turn. The plaintiffs argue that application of the term "disruptive" is applied by or on behalf of the Board in a way that effectuates viewpoint discrimination because "[a]nything [the School Board members] don't wish to hear is 'disruptive' to their worldview." Doc. No. 4-2, at 15. Similar to the term "offensive," the term "disruptive" reaches constitutionally-protected speech when it is applied to ideas being expressed. Because the evidence shows that the School Board applied the term "disruptive" to disruptive *ideas* rather than disruptive *conduct*, this too constitutes viewpoint discrimination.

Therefore, the District has not met its burden to show that the as-applied challenge is unlikely to succeed on the merits.

11

## B. Facial Challenge

The plaintiffs also challenge the following terms as unconstitutionally vague and overbroad: "personally directed," "abusive," "offensive," "otherwise inappropriate," "personal attack," "inappropriate," and "intolerant." Doc. No. 4-2, at 15–17.

### 1. Vagueness

A policy is unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pa. Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "Although there is no requirement of narrow tailoring in a nonpublic [or limited public] forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018). While some degree of discretion in how to apply a given policy is necessary, "that discretion must be guided by objective, workable standards" to avoid the moderator's own beliefs shaping his or her "views on what counts" as a policy violation. *Id.* at 1891. "The need for specificity is especially important where, as here, the regulation at issue is a 'content-based regulation of speech. The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.'" *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (quoting *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997)).

Policies 903 and 922 are vague because they are irreparably clothed in subjectivity. What may be considered "irrelevant," "abusive," "offensive", "intolerant," "inappropriate" or "otherwise inappropriate" varies from speaker to speaker, and listener to listener. For example, the District argues that, as applied, the "personally directed" element also requires one of the other

elements such as "abusive" or "offensive", yet the text of neither policy makes such a distinction or pairing. Nov. 12, 2021 H'rng Tr. at 40:12–41:4; *see also* Doc. Nos. 4-7 & 4-9. While the District's counsel contends that the lack of such a connection requiring "personally directed" plus another element "might just be a grammatical error," Nov. 12, 2021 H'rng Tr. at 40:25–41:4, this excuse only further confirms the vagueness of the policies. Even if a reasonable reading did require a personally directed "plus" comment (which it does not), the adjacent terms such as "abusive" and "irrelevant" are also vague. Calling for a School Board member's resignation, for example, is "personally-directed" and could be considered "irrelevant" to an underlying issue or problem, but it could also be considered highly relevant to the School Board member's role in creating or failing to address or solve the issue or problem.

In parsing out these subjective terms, the School Board has presented no examples of guidance or other interpretive tools to assist in properly applying Policies 903 and 922 to public comments. Policy 922 expressly requires the development of "administrative guidelines implementing this policy" including "examples of conduct/behavior that is in violation of this policy," yet the District has not developed such guidelines. Doc. No. 4-9, at 2; Nov. 8, 2021 H'rng Tr. at 167:4–12. The District presents no evidence of "objective, workable standards" to guide the presiding officer's exercise of discretion. *Mansky*, 138 S. Ct. at 1891. Allowing little more than the presiding officer's own views to shape "what counts" as irrelevant, intolerant, abusive, offensive, inappropriate, or otherwise inappropriate under the policies openly invites viewpoint discrimination. *Ctr. for Investigative Reporting*, 975 F.3d at 316.[7] "[T]he lack of structure and

---

[7]  The Court also notes that the policies do not provide authority for the School Board to delegate the presiding officer role to a neutral party. *See* Doc. No. 4-7. Policy 903 appears to envision that the School Board President will serve as the presiding officer, stating "The Board President will call speakers to the microphone in order according to the sign-in sheet." *Id.* at 4. The Assistant Solicitor is not listed as a School Board member. *See* https://go.boarddocs.com/pa/psbr/Board.nsf/Public (accessed Nov. 15, 2021).

clear policies governing the decision-making process creates a real risk that it may be arbitrarily applied." *Id.* at 317. Therefore, Policies 903 and 922 are not "capable of reasoned application" and the District has not demonstrated its likelihood of success on the facial challenge. *Mansky*, 138 S. Ct. at 1892.

### 2. Overbreadth

The Court will also address the overbreadth challenge as an additional basis for the plaintiffs' likelihood of success on the merits. "[V]agueness and overbreadth [are] logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). "A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution." *Sypniewski*, 307 F.3d at 258.

"[A] policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional." *Sypniewski*, 307 F.3d at 259. Further, the Third Circuit Court of Appeals has "adopted a 'more hesitant application,' of the overbreadth doctrine within public schools." *J.S. ex rel. Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011) (quoting *Sypniewski*, 307 F.3d at 259). School boards are unlike other deliberative legislative bodies because children regularly attend their meetings. *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 280 (3d Cir. 2011). However laudable the desire to be conscientious when it comes to adult behavior as may be witnessed by children,[8] the School Board cannot hide behind the possible presence of children to justify an unconstitutional policy. The burden to demonstrate that a policy is facially constitutional still rests on the School Board as the party opposing a preliminary injunction in a First Amendment context.

---

Yet it was Mr. Amuso, as the Assistant Solicitor, who enforced Policy 903 at the May 2021 meeting. Nov. 8, 2021 H'rng Tr. at 82:18–21, 116:14–25.

[8] The Court does not doubt that the School Board members have earnestly held views about what children should be learning. It is the reality that others have other views that prompts this case.

The policies here are overbroad because they prohibit a broad array of constitutionally protected speech. The policies prohibit speech that is "offensive," which the Supreme Court has specifically held is an unconstitutional restriction on protected speech. *Iancu*, 139 S. Ct. at 2301; *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). The Supreme Court has also found the term "abusive" overly broad in other contexts, reaching conduct outside the "fighting words" category of unprotected speech. *Gooding v. Wilson*, 405 U.S. 518, 525 (1972). The phrases "intolerant," "inappropriate" and "otherwise inappropriate" would appear to thwart even more protected speech than "abusive."

The School Board presents no persuasive argument in support of the constitutionality of these terms. For example, the School Board acknowledges that a taxpayer's opinions on hiring and firing school employees are relevant to its business. Nov. 8, 2021 H'rng Tr. at 141:4–7. However, the provision prohibiting "personally directed" comments must, under any reasonable interpretation, prohibit such commentary. The District Solicitor's comments during the December 2020 public meeting confirm this interpretation: Mr. Clarke stated that if someone "begin[s] to talk about 'the criminal behavior of this department' or 'how incompetent this one is,' that begins to violate our policy." Doc. No. 4-4 ¶ 18.

By characterizing criticism of a District employee's possible wrongful conduct or competence as "personally directed" or "abusive", the District itself demonstrates the overbreadth of its policy. An opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact relevant to the purpose of the limited public forum and presents a viewpoint against which the School Board may

15

not discriminate. While the School Board could sensibly prohibit personal attacks not related to the School Board's business (e.g., criticizing a school employee's personal relationships, accent or preferred home decor), Policies 903 and 922 contain no limiting language to support this interpretation as a reasonable one for purposes of overbreadth analysis. The Challenged Policy Terms reach too much protected speech under any reasonable interpretation of the language of the policies themselves.

Therefore, the District also fails to show that the Challenged Policy Terms are likely constitutional under the overbreadth analysis.

## C. Address Announcement Requirement

The plaintiffs argue that the address announcement provision is facially invalid because of its chilling effect on protected speech. "Being potentially forced to state their home address when speaking out on controversial issues weighs on Plaintiffs' minds, and inhibits their desire to keep speaking out for fear of reprisal by those who do not tolerate their points of view." Doc. No. 4-2, at 8–9. The District generally does not argue in support of the address announcement requirement, instead asserting that it has not been enforced since the June 2021 meeting.

The right to free speech also encompasses the right to refrain from speaking. *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018). Compelled speech is subject to the same analysis as prohibitions from speaking. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). As discussed above, school board meetings are a limited public forum where restrictions need only be reasonable and viewpoint-neutral. However, the District provides no argument in support of forcing speakers to state their home address. While the right to speak at Pennsbury School Board meetings is limited to students, employees, and residents within the District, requiring the speaker to announce their specific home address is an unreasonable restriction. Each

speaker's address can be collected when they sign up for their speaking slot.  Doc. No. 4-7, at 2. And in meetings besides the June 2021 meeting, speakers have simply provided their township when signing in and speaking.  Doc. No. 4-5 ¶ 13; Nov. 8, 2021 H'rng Tr. at 128:5–9.  In contrast, the chilling effect of being forced to announce to all present one's actual home address before speaking on a hotly-contested issue is clear.

Therefore, the School Board has not met its burden to demonstrate that it is likely to succeed on the merits with regard to either the Challenged Policy Terms or the address announcement requirement in Policies 903 and 922.

## II.    Risk of Irreparable Harm to Plaintiffs

Next, the plaintiffs must demonstrate that there is a risk of irreparable harm absent a preliminary injunction.  "If the government cannot establish that the law is constitutional, the challenger must still demonstrate irreparable harm, though that is generally presumed where the moving party's freedom of speech right is being infringed."  *Greater Phila. Chamber of Com.*, 949 F.3d at 133.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The District argues that this particular case does not present a risk of irreparable harm because the plaintiffs continued speaking at various School Board meetings after their comments were interrupted or terminated for violations of Policy 903.  Doc. No. 44-1, at 9.  They argue that any alleged harm is "speculative" and that the plaintiffs lack any evidence to support claims of chilled speech.  *Id.* at 10.

The Court recognizes that the plaintiffs spoke again at the meetings for which video records were supplied after the invocations of Policy 903, including some quite heated comments at the August 2021 meeting that went uninterrupted.  *See, e.g.*, Doc. No. 44-9, at 1:52:10.  Indeed, Mr.

Daly openly admits that he has at times "tested the boundaries" of the policies since the May 2021 meeting. Doc. No. 4-5 ¶ 12.

Here, however, the past is prologue. The School Board has stated that it will continue to enforce the policies in the future by arguing that its members and representatives believe the policies are necessary to prevent undesirable use of the five-minute periods. The School Board even hyperbolically predicts that refraining from enforcement would "undoubtedly" lead to violence. Doc. No. 44-1, at 11. Given that the School Board has vigorously defended its applications of Policy 903 thus far and admits no wrongdoing, a future meeting certainly raises the spectre of more interruptions and terminations of speech based on Policy 903. Mr. Marshall testified that the possibility of such terminations has already chilled his speech because he is conflict averse. Nov. 8, 2021 H'rng Tr. at 75:22–76:7. The Court considers this testimony credible, particularly in light of the presence of armed police officers and of security guards and the threat of removal from school property in front of fellow community members. Because any "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the Court finds that there is risk of irreparable injury to plaintiffs if the Challenged Policy Terms are not enjoined. *Elrod*, 427 U.S. at 373.

There is also risk of irreparable harm in allowing the address announcement requirement to stay on the books. The District argues that the requirement has not been enforced since June 2021. The plaintiffs do not dispute this. However, the District has provided no justification for its decision to invoke the requirement at the June 2021 meeting and has not stated to the public that the requirement will not be enforced in the future. Nov. 8, 2021 H'rng Tr. at 127:22–128:9 (acknowledging that no announcement regarding the relaxation of the address announcement requirement has been made). Because forcing speakers to announce their home address before

public comment is likely to chill speech, the plaintiffs have demonstrated that allowing the address announcement requirement to stay on the books raises a risk of irreparable harm.

## III.    Risk of Irreparable Harm to Defendants

The District argues that granting the preliminary injunction with respect to the prohibitions in Policies 903 and 922 raises a risk of irreparable harm to it because the preliminary injunction would effectively convert the School Board meetings from a limited public forum to a public forum and could lead to violence. The Court finds these arguments deliberatively provocative and unconvincing.

First, the District argues that "if the Court grants this relief, members of the public will be permitted to make obscene, irrelevant and personal attacks against anybody for 5 minutes during school board meetings." Doc. No. 44-1, at 11. Not so. The plaintiffs do not challenge the prohibition on "obscene" comments or the "reasonable decorum" requirement in their motion for a preliminary injunction.[9] Removal of the term "irrelevant" raises the biggest risk of reducing the effectiveness of public comment, but the District itself sets whether a comment period is open to agenda or non-agenda items. The five-minute time limit on each comment remains in place and the instances where Policies 903 and 922 have been applied each involved speech related to agenda items. The Court finds that the risk of speakers going too far afield in a five-minute time period appears minimal and is outweighed by the risk of free speech infringement.

---

[9]  At the preliminary injunction hearing, Mr. Amuso opined that accusing a School Board member of a financial crime was "obscene." Nov. 8, 2021 H'rng Tr. at 100:14–25. While not specifically at issue in this preliminary injunction motion, the Court reminds the District and its solicitors that the Supreme Court has defined the term "obscene" in a limited manner. *See Miller v. California*, 413 U.S. 15, 24 (1973) (defining obscene speech or materials as those "which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value"). As the Court reminded counsel during the hearing, accusations of criminality can more likely trigger defamation laws rather than obscenity standards.

Second, the District suggests that "it could also be argued that any such relief would be an infringement of the District's First Amendment rights to discuss school business only during these meetings." Doc. No. 44-1, at 11. It is unclear how this point "could be argued" because the District provides no further analysis. The District does not explain how government speech rights could be First Amendment rights. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). To the extent the District seeks to maintain a limited public forum, the analysis above addresses the concern about irrelevant uses of the five-minute speaking periods.

Third, the District argues that "allowing such speech would undoubtedly lead to violence, etc., which does not occur now as a result of the limited application of Policies 903 and 922 by the District." Doc. No. 44-1, at 11. However, the District provides no evidence to support its assessment that the requested relief would "undoubtedly" cause "violence, etc." In fact, the Court doubts it very much. The primary instances in which speakers became heated at the school board meetings at issue here involved yelling by Board representatives and/or the application of Policy 903 to force speakers to leave the microphone. It is possible that the requested injunctive relief could actually *decrease* the risk of violence at the meetings by preventing these verbal altercations over the disputed invocations of the Policy. The plaintiffs also do not challenge the portion of Policy 922 that requires notification of law enforcement if "any individual threatens harm or makes inappropriate physical contact with another individual." Doc. No. 4-9, at 1. Given that the requested relief does not remove the prohibition of "obscene" comments, the "reasonable decorum" requirement, or the requirement to notify law enforcement of threats, the District does not present convincing evidence that the injunctive relief would meaningfully change the threat of

20

violence from its current level.[10]  The Court agrees that there can be reasonable restraint, and the remaining portions of Policies 903 and 922 serve this purpose.[11]

The District does not maintain that the address announcement requirement is necessary to prevent harm and has, in fact, decided not to enforce it since June 2021.  Therefore, the Court does not view the requested injunction against enforcement of the address announcement requirement as likely to cause the District any harm.

## IV.    Public Interest

Lastly, the District asserts the same concerns regarding "unfettered" use of the five-minute periods and violence to argue that granting the public injunction would not promote the public interest.  Doc. No. 44-1, at 11.  However, "the enforcement of an unconstitutional law vindicates no public interest."  *K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).  If the movant demonstrates a likelihood of success on the merits, "the public interest leans even more toward granting the injunction."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 597 (3d Cir. 2002).

Because the District has failed to demonstrate a likelihood of success on the merits, the preliminary injunction will serve the public interest by protecting First Amendment free speech rights.  *Am. Freedom Def. Initiative v. SEPTA*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015) (noting that "many courts have held that there is a significant public interest in upholding First Amendment

---

[10]  To the extent the District continues to maintain that Policy 922 is not really intended for School Board meetings, this ruling does not prevent the District from adding the same language from Policy 922 to Policy 903 regarding notification of law enforcement when individuals threaten harm or make inappropriate physical contact.

[11]  The plaintiffs alternatively propose that the Court "impose a limiting construction on the terms 'irrelevant' and 'disruptive' to limit their application to speakers who are addressing matters wholly unrelated to school board business or whose manner of speech—not viewpoint—is likely to cause public disorder or interfere with others' rights to speak."  Doc. No. 4-2.  The Court finds this approach unnecessary because the remaining policy requirements (the prohibition on "obscene" speech, the "reasonable decorum" requirement, and the notification of law enforcement of threats or physical harm) can achieve this goal.

principles"); *Monroe v. Houston Indep. Sch. Dist.*, 419 F. Supp. 3d 1000, 1008–10 (S.D. Tex. 2019) (finding that a preliminary injunction against a similar school board policy prohibiting "offensive or derogatory remarks" promoted the public interest).

## V.    Bond Requirement

Because the Court will grant the preliminary injunction, it is necessary to determine whether a bond requirement should be set. Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the Third Circuit Court of Appeals has recognized that "an extremely narrow exception exists 'when complying with the preliminary injunction raises no risk of monetary loss to the defendant.'" *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (quoting *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir. 1990)). "In noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991) (internal quotation marks omitted). This "exception involves a balance of the equities of the potential hardships that each party would suffer as a result of a preliminary injunction. Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996).

The plaintiffs argue that the Court should waive the Rule 65(c) bond requirement because complying with the preliminary injunction raises no risk of monetary loss to the defendants and the balance of the equities weighs in their favor. Doc. No. 4-2, at 18–19 (citing *Zambelli Fireworks Mfg. Co.*, 592 F.3d at 426). The District does not request a bond. There is no evidence of risk of

monetary loss to the District from allowing speakers to complete their full five minutes and from not enforcing the address announcement requirement. The preliminary injunction protects First Amendment rights and vindicates the public interest. Balancing the equities in this case, the Court finds that waiver of the Rule 65(c) security requirement is appropriate.

## CONCLUSION

For the foregoing reasons, the Court grants the preliminary injunction and will enjoin the District from enforcing the Challenged Policy Terms and the address announcement requirement during the pendency of this litigation. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE