IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS MARSHALL, et al., *Plaintiffs* | : : : | CIVIL ACTION |
| v. | : : | |
| PETER C. AMUSO, et al., *Defendants* | : : : | No. 21-4336 |

### MEMORANDUM

PRATTER, J.                                                                                                                                                                      APRIL 4, 2022

Four residents of the Pennsbury School District challenge the School Board's policies restricting speech at its meetings. They filed suit against the District, as well as the individual members of the School Board, certain administrative officials, and the District's Solicitor and Assistant Solicitor in their individual and official capacities. The Court has granted Plaintiffs' request for a preliminary injunction to prevent enforcement of certain provisions of the challenged policies, and now considers Defendants' motion to dismiss various portions of the Complaint. For the reasons that follow, the Court grants the Defendants' motion in part and denies in part.

### BACKGROUND

**I.**     **School Board Policies**

The Pennsbury School Board policy manual allows members of the public five minutes of speaking time at School Board meetings. Due to the pandemic, the School District held its board meetings online (or online with limited in-person audience capacity) from April 2020 through April 2021. Public speakers were asked to provide their commentary in writing, to be read at the meeting.

Public comment is subject to Policies 903 and 922. Policy 903 limits speakers in the first, one-hour public comment period to addressing meeting agenda items and then allows those who

1

have not already spoken to speak during a subsequent 30-minute period after a voting segment. Policy 903 requires speakers to announce their name and address before making their comments. Doc. No. 4-7, at 3.[1] The policy allows the presiding officer to "[i]nterrupt or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant." *Id.* at 3. Policy 903 also forbids speakers from bringing banners or placards that are "[o]ffensive," "otherwise inappropriate," or "that contain personal attacks." *Id.* at 4. The policy provides that "[i]ndividuals who repeatedly violate this policy may have restrictions imposed on their right to be present or to speak at School Board meetings." *Id.* at 3. Policy 922, the "Civility Policy," provides that "[o]ffensive, inappropriate, intolerant, and/or threatening speech or behavior erodes the civil, orderly, and respectful environment that the Board seeks to promote in district schools, on district property, and at district-sponsored events and activities." Doc. No. 1, Compl. ¶ 35; Doc. No. 4-9, at 2.

## II. The Incidents

The alleged violations of Plaintiffs' free speech rights spanned from December 3, 2020 to June 17, 2021 (and extend to the present, based on the allegations of chilled speech). The incidents described in the Complaint involve 1) rejection of Plaintiffs' written comments by the Board in advance of the online Board meetings; 2) video editing of Plaintiff Douglas Marshall's comments; 3) termination of comments specific to the District's equity policy during the March 18, 2021 meeting; and 4) interruption of Mr. Campbell's comments on June 17, 2021.

### A. Written Comments Rejected in Advance of Online Board Meetings

During the virtual meetings period, Plaintiff Robert Abrams submitted comments critical of the School Board and Pennsbury personnel. Criticisms included calling for the removal of

---

[1] Although Policy 903 is not attached to the Complaint, the Court considers it at the motion to dismiss stage because it is "integral" to the Complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

Solicitor Michael Clarke and Assistant Solicitor Peter Amuso, as well as the resignation of certain board members.

At a December 3, 2020 meeting, School Board President Christine Toy-Dragoni and Mr. Clarke discussed reviewing written comments deemed to be "personally directed" before each meeting and then editing or excluding any statements that they found to violate Policy 903. Compl. ¶¶ 41–43. School Board Member Howard Goldberg stated that the Board should not read "offensive" comments into the record. Mr. Abrams and Plaintiff Tim Daly then submitted comments to be read at the December 17, 2020 public meeting. Neither comment was posted online, read at the meeting, or made part of the meeting record.

Mr. Daly and Mr. Abrams submitted written comments again on January 21, 2021 stating that the School Board "showed a lack of leadership," criticizing the search for a new superintendent and accusing Pennsbury of financial mismanagement. *Id.* ¶¶ 48, 50. Defendant Ann Langtry emailed to both Mr. Daly and Mr. Abrams the Board's rejections of their submitted comments "for being personally directed, abusive, obscene, and/or irrelevant," and offered each a half hour to resubmit an edited comment before the meeting. *Id.* ¶¶ 49, 51. Both Mr. Daly and Mr. Abrams also submitted comments for the February 18, 2021 meeting, but no public comments were read aloud at this meeting.

Mr. Abrams again submitted comments for the March 4, 2021 meeting related to censorship of speech and use of the District's "Contingency Fund." *Id.* ¶ 56. Ms. Langtry again responded that his comment was declined "[i]n accordance with Board Policy 903, . . . for being personally directed, abusive, obscene, and/or irrelevant." *Id.* ¶ 57.

### B. Video Editing of Mr. Marshall's Comments

Mr. Marshall then spoke at the March 18, 2021 Board meeting to express his disagreement with the teaching of critical race theory. His comments included discussions of the Ku Klux Klan as a leftist organization and statistics about unarmed white men killed by police. Two days after Mr. Marshall's comments, Pennsbury's Director of Equity, Diversity, and Education, Cherrissa Gibson, wrote to Ms. Toy-Dragoni and Superintendent William Gretzula to opine that Mr. Marshall's comments were "offensive and abusive" in violation of Board policy. *Id.* ¶¶ 69–70.[2] Ms. Toy-Dragoni apologized for not muting Mr. Marshall's comments and had the video of the Board meeting edited to excise certain of his historical references with a disclaimer stating: "A portion of this recording was edited due to content." *Id.* ¶¶ 77, 79–81. Following purported public outcry, the Board restored the original recording of the March 18, 2021 meeting with a new disclaimer that the Board does not endorse any statement by any member of the public.

### C. Terminated Equity Comments

The May 20, 2021 Board meeting included a presentation on equity by Dr. Gibson as an agenda item, with Mr. Amuso as the presiding officer. When, during the public comment period, Mr. Daly began to give a statement in support of Mr. Marshall's previous comments, Mr. Amuso stopped him and stated that the Board was "not going to tolerate misrepresentation of facts around equity. So, it's irrelevant and you can stop." *Id.* ¶ 89. As Mr. Daly threatened legal action, Mr. Amuso shouted "I said you're done" repeatedly in an effort to terminate Mr. Daly's comments. *Id.*

---

[2] Specifically, Ms. Gibson opined that Mr. Marshall used "coded, racist terms, also known as 'dog whistles'" that are "seemingly innocuous speech often not noticeable to some, but explicitly communicate a more insidious and abusive message to a subset of the audience, in this case black and brown students and community members." *Id.* ¶ 72. .

4

Mr. Marshall spoke next. He began with critical comments calling the equity policy the "critical race theory audit." *Id.* ¶ 90. Mr. Amuso interrupted him, saying that such comments were irrelevant because that was not the policy's name. *Id.* After Mr. Marshall continued for a couple of minutes and then began discussing "first-generation Nigerian immigrants," Mr. Amuso shouted "You're done!" eleven times and ended Mr. Marshall's speech. *Id.* ¶ 92–93.

The last to speak, Mr. Abrams began to talk about a poll of the community's views of the equity policy. Mr. Amuso stopped him too with the same "You're done!" exclamations. *Id.* ¶ 95.

### D. Interruption of Mr. Campbell's Comments

At a June 17, 2021 meeting, the School Board discussed agenda item "KKK", which would amend Policy 903 to require speakers to choose between speaking on agenda or non-agenda items. *Id.* ¶ 102. During his comment period, Plaintiff Simon Campbell criticized Policy 903 and the School Board, calling board members "snowflakes", addressing Ms. Toy-Dragoni as "School Board President Benito Mussolini", and criticizing the School Board for violating First Amendment rights. *Id.* ¶ 103. Mr. Clarke, acting as the presiding officer, interrupted him stating "if you make personal insults like that again, or if you personally direct your comments will be asked to step away from the podium . . . do not do name-calling like you just did." *Id.* ¶ 104.

### E. Address Requirement

Plaintiffs also assert that, under Policy 903, they were required to announce their home address prior to speaking at some meetings. This Policy, Plaintiffs contend, "direct[s] potential reprisal to their homes" and so serves to intimidate speakers who express controversial views. *Id.* ¶ 157.

### III. The Preliminary Injunction

Shortly after filing this suit, Plaintiffs also filed a motion for a preliminary injunction to prevent the enforcement of certain terms in Policies 903 and 922 to restrict speech at Pennsbury

5

School Board Meetings. This Court granted the injunction on November 17, 2021. Doc. No. 53. Specifically, the preliminary injunction order enjoins Defendants from enforcing:

1. Pennsbury School Board Policy 903's prohibitions of speech deemed "personally directed," "abusive," "irrelevant," "offensive," "otherwise inappropriate," or "personal attacks";
2. Pennsbury School Board Policy 922's prohibitions of speech deemed "offensive," "inappropriate," "intolerant," "disruptive," and "verbally abusive"; and
3. Pennsbury School Board Policy 903's requirement that speakers at public comment periods preface their remarks by announcing their address.

In granting the preliminary injunction, this Court found that "the plaintiffs are likely to demonstrate that the challenged policy provisions violate the First Amendment's prohibition on viewpoint discrimination." Doc. No. 52, at 1.

### Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989). The Complaint must contain enough factual matter to push the claim from merely possible to "plausible." *Twombly*, 550 U.S. at 555–56.

### Analysis

Defendants move to dismiss the Complaint on various grounds. The Court will address each argument in turn.

I. **First Amendment**

First, prior to this Court granting the preliminary injunction, Defendants argued that the Complaint fails to state a claim because the allegations do not establish a violation of the First

6

Amendment. Specifically, they argued that the Complaint should be dismissed "because there are no specific facts alleged that any Plaintiff was restricted from exercising any protected speech based upon his viewpoint"; that "District Policies 922 and 903 are constitutional *on their face*"; and that "District Policies 922 and 903 were *applied* in [a] constitutional manner." Doc. No. 43 ¶¶ 39, 43–44 (emphases added).

Then came the Court's preliminary injunction decision. The Defendants conceded at oral argument that this Court's decision effectively moots this portion of their motion to dismiss. There, the Court found that (1) the challenged policy terms are overly broad and vague because they are prone to subjective interpretation; and (2) the terms invoked to terminate the offensive comments ("abusive" and "personally directed") run counter to precedent establishing that prohibition of "offensive" speech is viewpoint discrimination under the First Amendment. *See* Doc. No. 52, at 9–16. For the same reasons, the Court finds that Plaintiffs have stated a plausible claim for violations of the First Amendment and so will deny this portion of the motion to dismiss.

## II. Conspiracy

Next, Defendants argue that Plaintiffs have failed to state a plausible conspiracy claim. Plaintiffs assert their conspiracy theory in the alternative, arguing that either all "Defendants 'acted under color of state law' in violating Plaintiffs' free speech rights" *or*, if Mr. Amuso and Mr. Clarke were not acting in their official capacities, then "[Mr.] Amuso and [Mr.] Clarke (and possibly other Defendants), acting in their individual or private capacities, conspired to use school district authority against Plaintiffs to silence their speech." Doc. No. 55, at 10 (quoting Third Cir. Model Civ. Jury Instrs. 4.3 & 4.4.2 (Aug. 2020)).

## A. Intracorporate Conspiracy Doctrine

First, Defendants argue that the intracorporate conspiracy doctrine bars Plaintiffs' conspiracy claim. Under the intracorporate conspiracy doctrine, "an entity cannot conspire with one who acts as its agent." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). This doctrine "applies to claims of federal civil rights conspiracy." *Shingara v. Skiles*, 274 F. App'x 164, 168 (3d Cir. 2008). As the Defendants see it, because the School Board members all work for the School Board, they cannot have conspired with the School Board to violate the Plaintiffs' First Amendment rights.

Though agents acting in their *official* capacities cannot be held liable for civil conspiracy, agents can be held liable if they were acting in their *individual* capacities. *Cannon v. City & Cnty. of Phila.*, No. 14-cv-5388, 2014 WL 7399037, at *8 (E.D. Pa. Dec. 30, 2014) (citing *Heffernan v. Hunter*, 189 F.3d 405, 412–13 (3d Cir. 1999)). And plaintiffs are permitted to plead in the alternative. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). That is what the Plaintiffs have done here. Plaintiffs argue that, if Mr. Amuso or Mr. Clarke did act outside of their official capacities, they were not acting as agents of the District, and, as such, conspired with the District in their individual capacities. In such a scenario, the intracorporate conspiracy doctrine is inapplicable.

## B. Plausible Claim

Defendants also argue that Plaintiffs fail to plead sufficient factual matter to establish a claim for a conspiracy depriving them of constitutional rights under § 1983. They emphasize that "conscious parallelism" is insufficient to establish a conspiracy. Doc. No. 58, at 4 (citing *Spencer*

8

*v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)). "[T]o state a claim for conspiracy under § 1983, [the] plaintiff must make 'factual allegations of combination, agreement, or understanding among all or between any of the defendants or coconspirators to plot, plan, or conspire to carry out the alleged chain of events.'" *Id.* at 1020 (quoting *Hammond v. Creative Fin. Plan. Org., Inc.*, 800 F. Supp. 1244, 1249 (E.D. Pa. 1992)). In other words, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010). Defendants argue that the Complaint fails to state a conspiracy claim because "there are no allegations as to when any agreement was formed, the agreed upon conduct, and/or the scope and length of the agreement." Doc. No. 58, at 4.

But Plaintiffs have actually included sufficient facts regarding an agreement. Plaintiffs allege that, at the December 3, 2020 School Board meeting, "[Mr.] Clarke, [Ms.] Toy-Dragoni, and [Mr.] Goldberg all endorsed a plan of unlawful censorship, in which the other school board members apparently acquiesced and ratified." Compl. ¶ 153. The allegations concerning the rejection of Mr. Abrams and Mr. Daly's submitted comments, the video editing of Mr. Marshall's speech and Mr. Amuso and Mr. Clarke's interruption of public comments at subsequent in-person Board meetings show overt acts in furtherance of the common purpose from December 2020 to June 2021. *Id.* ¶¶ 89–101. Therefore, Plaintiffs have pled sufficient factual matter for their conspiracy claim to survive the motion to dismiss stage.

**III. State Actor**

Defendants assert that Mr. Amuso and Mr. Clarke, as solicitors representing the District, are not state actors acting "under color of state law" for § 1983 claims. They argue that being an

9

attorney is not sufficient to establish action under color of state law and, by implication, argue that Mr. Amuso and Mr. Clarke also are not state actors as agents of the District.

"A person may be found to be a state actor when (1) he is a state official, (2) he has acted together with or has obtained significant aid from state officials, or (3) his conduct is, by its nature, chargeable to the state." *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277 (3d Cir. 1999); *see also Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (outlining the "three broad tests").

Here, according to the Complaint, Mr. Amuso and Mr. Clarke did not merely act as outside legal advisers to the District; rather, they served as the "enforcers" of Policy 903 at the Board meetings. Compl. ¶¶ 89, 104. Defendants do not dispute that anyone (attorneys or otherwise) who engages in "joint activity" with state actors is also considered as acting "under color of state law" for § 1983 purposes, even if they are not agents of the state entity. Doc. No. 43-1, at 16 (citing *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 644 (E.D. Pa.), *aff'd*, 572 F. App'x 68 (3d Cir. 2014)).

Plaintiffs allege that Mr. Amuso acted as the "enforcer of Policy 903" at the May 2021 Board meeting and terminated Mr. Marshall, Mr. Abrams, and Mr. Daly's respective comments, Compl. ¶ 89, and that Mr. Clarke acted as the "enforcer of Policies 903 and 922" at the June 2021 meeting and interrupted Mr. Campbell's comments, *id.* ¶ 104. Plaintiffs also allege that Ms. Toy-Dragoni stated that "our solicitors . . . make the decision that something is in violation" of the speech policies. *Id.* ¶ 30. Plaintiffs have alleged sufficient factual matter to establish a theory of joint activity between Mr. Amuso and the School Board and between Mr. Clarke and the School Board. Plaintiffs have also sufficiently alleged that their conduct is chargeable to the state because they acted as the District's "enforcers" of Policy 903 and terminated comments at the School Board meetings. Under either theory of state action, Plaintiffs have sufficiently pled § 1983 liability for Mr. Amuso and Mr. Clarke.

## IV. Merger

Defendants also argue that the § 1983 claims against the School Board members in their official capacities merge with the claims against the District and should be dismissed. This is because "[o]fficial-capacity suits, in contrast [to personal-capacity suits], 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because "the real party in interest is the entity," the official can and should be dismissed, so long as the employer "receives notice" of the claims "and an opportunity to respond." *Id.*; *accord Baez v. Lancaster Cnty.*, 487 F. App'x 30, 32 (3d Cir. 2012). However, the merger doctrine applies only to official-capacity suits, so the individual-capacity claims remain.[3] *Dorsey v. Pennsbury Sch. Dist.*, No. 20-cv-863, 2021 WL 4440528, at *2 (E.D. Pa. Sept. 28, 2021).

Recognizing that duplicative official-capacity claims must be dismissed, Plaintiffs ask this Court to use its discretion to delay determining which claims are redundant. Doc. No. 55, at 11. Some "courts in this District have declined to dismiss official capacity suits as redundant at this early stage of litigation if doing so would serve no laudable purpose." *Hellyer v. Cty. of Bucks*, No. 10-cv-2724, 2014 WL 413874, at *8 (E.D. Pa. Jan. 31, 2014) (internal quotation marks omitted). Plaintiffs argue that this case is unique because "some of the defendants are interposing defenses that they were not state actors" (namely, Mr. Clarke and Mr. Amuso). Doc. No. 55, at 11. But this is not a reason to keep duplicative official-capacity claims in the litigation, unless there is a scenario where an official-capacity claim against Mr. Clarke or Mr. Amuso could survive while the corresponding claim against the District does not. Plaintiffs have articulated no such scenario. And, while they argue that dismissing the official-capacity claims would "serve no

---

[3] Ms. Langtry has retired and is sued only in her individual capacity. Compl. at 2.

11

laudable purpose," Plaintiffs fail to show that allowing the claims to proceed would serve any laudable purpose. Because Plaintiffs have already received a preliminary injunction and have continued to pursue numerous claims against numerous defendants, the Court finds that narrowing the focus will aid resolution of this dispute. Therefore, application of the merger doctrine is appropriate and the official-capacity claims against the Individual Defendants will be dismissed as duplicative.

## V.  Personal Involvement

Defendants next argue that the Complaint fails to allege personal involvement by several of the individual defendants. A complaint must allege "personal involvement in the alleged wrongs" by each defendant. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.*

First, Defendants argue that there are no allegations to support personal involvement by Michael Pallotta, Sherwood Taylor, and Gary Sanderson. Indeed, the Complaint does not allege any particular action by any of those three. Instead, Plaintiffs pursue a theory of general acquiescence by all Board members, alleging that each "individual Defendant board member was well-aware of the censorship occurring in his or her presence, acquiesced in it, endorsed [Ms.] Toy-Dragoni's commitment to censorship, and supported the adoption of more censorious policies as a reaction to Plaintiffs' speech." Compl. ¶ 105. But the Complaint does not set forth any allegations of actual knowledge and acquiescence by Mr. Pallotta, Mr. Taylor, or Mr. Sanderson with particularity. Although Plaintiffs argue that "acquiescence can occur through silent acceptance," Doc. No. 55, at 5 (quoting 3d Cir. Model Civil Jury Instr. 4.6.1), they do not even

allege whether each of these Board members was present at each meeting. Therefore, the Court will dismiss the claims against Mr. Pallotta, Mr. Taylor, and Mr. Sanderson without prejudice.

Next, Defendants argue that the allegations against Defendants Linda Palsky, T.R. Kannan, Debra Wachspress, and Howard Goldberg are too bare to support personal involvement. As to Ms. Palsky, Mr. Kannan, and Ms. Wachspress, the Complaint alleges that each made a single comment in support of Mr. Amuso's application of Policy 903 to terminate Plaintiffs' May 2021 comments: Ms. Palsky said "well put"; Mr. Kannan said that he was "glad";[4] and Ms. Wachspress thanked Mr. Amuso. Compl. ¶¶ 98–100. These allegations establish that these three Board members were present at the May 2021 meeting. The allegations about Ms. Palsky, Mr. Kannan, and Ms. Wachspress's active endorsement of Mr. Amuso's termination of Plaintiffs' comments, while sparse, provide sufficient particularity to survive a motion to dismiss.

The Complaint also alleges that Mr. Goldberg spoke at the December 2020 meeting and recommended that offensive comments submitted in advance of online meetings not be read into the record. Compl. ¶ 44. Mr. Abrams and Mr. Daly submitted comments for the December 2020 meeting that were not read into the record. *Id.* ¶¶ 46–47. These allegations support a plausible inference that Mr. Goldberg was personally involved in the application of Policy 903's prohibition on offensive comments to Mr. Abrams and Mr. Daly's speech. Therefore, the Court will also deny the motion to dismiss the claims against Mr. Golberg for lack of personal involvement.

## VI. Ms. Langtry and Dr. Gibson as Non-Policymakers

Next, Defendants argue that Dr. Gibson and Ms. Langtry are administrative employees not subject to § 1983 liability because they have no decision-making or policymaking authority. Dr.

---

[4] The Complaint also alleges that Mr. Kannan responded to a July 30, 2020 email from Mr. Abrams by stating "I will be glad to read your comments as long as [they are] not personally directed, abusive, obscene or irrelevant." Compl. ¶ 40.

Gibson is Pennsbury's Director of Equity, Diversity, and Education, and Ms. Langtry is Pennsbury's former Supervisor of Communication Strategies. Defendants argue that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). But this principle applies only to whether an official acting in their official capacity may subject the *government* to liability.

Ms. Langtry is sued only in her personal capacity. As a result, it is not relevant whether her actions may subject the government to § 1983 liability. For Dr. Gibson, Plaintiffs assert both official-capacity and personal-capacity claims, but the official-capacity claim has already been dismissed under the application of the merger doctrine above. Therefore, it is only necessary to analyze the personal-capacity claims against both defendants.

Unlike an official-capacity claim, "to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Sullivan*, 526 U.S. at 50 (internal quotation marks omitted). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks omitted).

Plaintiffs allege that Ms. Langtry acted under color of state law when she emailed Mr. Daly and Mr. Abrams to inform them that their comment submissions were declined under Policy 903 and when she coordinated the replacement of Mr. Marshall's comments with the edited video footage. Compl. ¶¶ 18, 49, 51, 57, 79. In contrast to purely private actors, "public officials

14

responsible for administering" an allegedly unconstitutional policy act under color of state law for § 1983 purposes. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999). The Complaint has pled "personal involvement in the alleged wrongs" by Ms. Langtry, as the administrator who declined comment submissions under the allegedly unconstitutional policy. *Rode*, 845 F.2d at 1207. Therefore, the personal-capacity claims against Ms. Langtry will not be dismissed.

As for Dr. Gibson, Plaintiffs argue that she instigated "many of the most extreme measures." Doc. No. 55, at 6. Specifically, Plaintiffs allege that Dr. Gibson acted in her capacity as the District's Director of Equity, Diversity, and Education in urging the video edits of Mr. Marshall's comments and stricter enforcement of Policy 903 beginning in March 2021. Per the Plaintiffs, she "acted as a prime ringleader: she prescribed Pennsbury's official ideology, decreed which words were heretical, [and] demanded particular censorious action. . . ." Compl. ¶ 105.[5] Although Dr. Gibson was not responsible for administering Policy 903, "[i]t is enough that [s]he is a willful participant in joint activity with the State or its agents." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). Because Plaintiffs have sufficiently pled personal involvement by Dr. Gibson in joint activity with agents of the District, the Court will not dismiss the personal-capacity claims against Dr. Gibson at this juncture.

## VII. Qualified Immunity

Defendants also argue that all of the individual defendants are entitled to qualified immunity because they did not violate any *clearly established* rights at the time of the alleged

---

[5] Plaintiffs also allege that Ms. Toy-Dragoni asked for Dr. Gibson's approval of her public statement in response to Mr. Marshall's March 2021 comments and that Dr. Gibson drafted this public statement. Compl. ¶¶ 77–78, 82. Because "authority to make municipal policy may be . . . delegated by an official who possesses such authority," this provides an additional ground for rejecting Defendants' argument that the defendant must have "final policymaking authority" to subject the District to liability. *City of St. Louis*, 485 U.S. at 124–25. But because the official-capacity claims merge with the claims against the District, it is not necessary to reach this issue.

violations. "[Q]ualified immunity protects government officials from liability only for civil damages," not declaratory or injunctive relief. *Child. First Found., Inc. v. Legreide*, 373 F. App'x 156, 158 n.2 (3d Cir. 2010). Here, in addition to a permanent injunction, Plaintiffs seek nominal damages of $17.91, as well as punitive and exemplary damages for claims against the individual defendants, and costs of suit including attorneys' fees and costs under 42 U.S.C. § 1988. Compl. at 64.

"Qualified immunity is an affirmative defense which must be decided as a matter of law by the court." *Child. First Found., Inc.*, 373 F. App'x at 159. Although "[s]tate executive officials are not entitled to absolute immunity for their official actions," *Hafer v. Melo*, 502 U.S. 21, 29 (1991), "[t]he doctrine of qualified immunity protects government officials from civil damage suits for official conduct that does not violate clearly established law of which a reasonable person would have known," *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006).

Under controlling Supreme Court and Third Circuit precedent, citizens have—and have had—a clearly established constitutional right not to be discriminated against based on their viewpoints unless such discrimination is necessary to further a compelling governmental interest. *See Monteiro*, 436 F.3d at 404. That means that a public official cannot exclude a citizen from a public meeting "with [the] intent to suppress [her] speech on the basis of viewpoint." *Monteiro*, 436 F.3d at 404. That is exactly what the Plaintiffs alleged here: they claim to have been "kicked out" of the May 2021 meeting for expressing their viewpoints. Compl. ¶ 97.

Nor can a public official prohibit speech just because it is deemed offensive. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because

16

society finds the idea itself offensive or disagreeable."). Again, that is what Plaintiffs accuse Defendants of doing.

Attempting to sidestep these cases and "bedrock" principles, Defendants claim that no precedential case involves the same context as this one: public comments at a school board meeting. But a right does not have to have been applied in the exact same situation for it to be clearly established. There does not have to be "a case directly on point," so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12.

Defendants also attempt to distinguish the case law as involving a public forum rather than a limited public forum. But the Supreme Court's decision in *Rosenberger* clearly states that a school's viewpoint discrimination is unconstitutional "even when the limited public forum is one of its own creation." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 313 (3d Cir. 2020), *cert. denied sub nom. SEPTA v. Ctr. for Investigative*, No. 20-1379, 2021 WL 4507651 (Oct. 4, 2021) (noting that "viewpoint discrimination is impermissible in any forum").

Lastly, Defendants argue that the individual defendants should be shielded from liability because "the challenged policy terms were derived from a model policy circulated by the Pennsylvania School Board Association ('PSBA')" and it would be reasonable to rely on this policy. Doc. No. 58, at 3.[6] But the Complaint does not allege, and Defendants have not argued, that any particular individual defendant relied on—or, aside from possibly Mr. Amuso, even knew about the existence of—a PSBA form at the time of the alleged constitutional violations.

---

[6] The PSBA form has not been presented to the Court and, if it had been, would fall outside the pleadings. As a general rule, consideration of this evidence would be improper at the motion to dismiss stage. *See* Fed. R. Civ. P. 12(d).

Defendants also cite no case law to support the proposition that reliance on a policy form categorically establishes qualified immunity.[7]

"[D]rawing all inferences in Plaintiffs' favor, as we must for the purposes of a motion to dismiss, Plaintiffs make plausible a claim of viewpoint discrimination. . . . Granting Defendants qualified immunity is therefore patently inappropriate at this stage of the proceedings." *Child. First Found., Inc.*, 373 F. App'x at 160. The Court finds that the prohibition on viewpoint discrimination in a school's limited public forum was clearly established at the time of the alleged violations, and thus, qualified immunity does not bar the claim for damages at the motion to dismiss stage.

## VIII. Mr. Campbell's Standing

Lastly, Defendants argue that without plausible allegations of actual harm, Mr. Campbell does not establish standing to participate in this lawsuit as a plaintiff. Doc. No. 43-1, at 10. They argue that Mr. Campell was allowed to finish speaking at the June 2021 meeting, so he can allege only conjectural or speculative harm.

But enforcement of an unconstitutional speech policy completes a First Amendment violation. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("[I]t is undisputed that Uzuegbunam experienced a completed violation of his constitutional rights when respondents enforced their speech policies against him."). "[A] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [policy], and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotation marks omitted).

---

[7] At oral argument, Defendants conceded that qualified immunity would not apply if a policy form was clearly unreasonable.

18

Here, the Complaint alleges that Mr. Clarke "loudly interrupted and began speaking over" Mr. Campbell's June 17, 2022 comment, citing Policy 903. Compl. ¶ 104. Mr. Clarke specifically interrupted Mr. Campbell to inform him of his infringement of the policies by making "personally direct[ed] comments." *Id.* This enforcement of the allegedly unconstitutional speech policies reduced Mr. Campbell's speech time. The Complaint also alleges that Mr. Campbell's speech has been chilled along with that of the other plaintiffs and, although they intend to continue to speak at meetings, the threat of enforcement has led to self-censorship as to the content of that speech. Compl. ¶ 106. This too provides Mr. Campbell standing. *See Susan B. Anthony List*, 573 U.S. at 159. Therefore, the Court will not dismiss Mr. Campbell's claims for lack of standing.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss in part and denies it in part. The claims against the individual defendants in their official capacities are dismissed as duplicative and all claims against Mr. Pallotta, Mr. Taylor, and Mr. Sanderson are dismissed without prejudice. An appropriate order follows.

**BY THE COURT:**

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE